1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            EASTERN DISTRICT OF CALIFORNIA
10
11   DANIEL ALLEN BLUNT,                    Civil No.    06cv0463-IEG (AJB)
12                          Petitioner,
13                                          ORDER DENYING PETITION
            vs.                             FOR WRIT OF HABEAS CORPUS
14                                          AND ISSUING A LIMITED
     JAMES YATES, Warden, et al.,           CERTIFICATE OF APPEALABILITY
15
                            Respondents.
16
17
18                                  I.
19                      FEDERAL PROCEEDINGS
20          Daniel Allen Blunt (hereinafter "Petitioner"), is a state prisoner proceeding pro se and

21   in forma pauperis with a Petition for a Writ of Habeas Corpus by a Person in State Custody

22   pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  Petitioner challenges his Tulare County Superior

23   Court convictions for first degree murder, burglary, and receiving stolen property, as well as his

24   sentence of twenty-five years to life in state prison, presenting sixteen grounds for relief.

25          Respondent has filed an Answer to the Petition, accompanied by a Memorandum of

26   Points and Authorities in support thereof, and has lodged portions of the state court record.

27   (Doc. Nos. 14, 16.)  Respondent contends that habeas relief is unavailable because grounds

28   three, four, five, fourteen and fifteen are procedurally defaulted, ground four is barred by the

doctrine announced in <u>Teague v. Lane</u>, 489 U.S. 288 (1989), and the adjudication by the state courts of the remaining claims, except ground sixteen, was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (Memorandum of Points and Authorities in Support of Answer ["Ans. Mem."] at 13-80.) Respondent does not address ground sixteen. Petitioner has filed a Traverse. (Doc. No. 22.)

This matter has been assigned to visiting Judge Irma E. Gonzalez, Chief United States District Judge for the Southern District of California. (Doc. No. 23.) For the following reasons, the Court finds that Petitioner is not entitled to habeas relief as to any claim presented, but has satisfied the threshold showing for a limited Certificate of Appealability.

## II.

## STATE PROCEEDINGS

In a four-count Information filed in the Tulare County Superior Court on July 24, 1998, Petitioner and his co-defendants Larry Ward, James Potts and Randy Spohn were charged with one count of murder in violation of Cal. Penal Code section 187(a), accompanied by two special circumstance allegations that the murder was committed during the commission of a robbery and during the commission of a burglary; one count of robbery in violation of Cal. Penal Code section 211; one count of burglary in violation of Cal. Penal Code section 459; and one count of receiving stolen property in violation of Cal. Penal Code section 496(a). (Lodgment No. 21, Clerk's Transcript ["CT"] at 346-51.) The Information also alleged as sentencing enhancements that Ward and Spohn personally used a deadly weapon and personally inflicted great bodily injury during the commission of the offenses, that Petitioner had suffered four prior felony convictions, and that Potts had suffered two prior felony convictions. (Id.) The prosecution sought the death penalty as to all four defendants. (CT 360.)

On August 5, 1999, two weeks before trial commenced, Randy Spohn pleaded guilty to a reduced charge of one count of second degree murder, and pleaded no contest to one count of robbery. (CT 878.) The plea agreement provided that Spohn would be sentenced to fifteen years to life in state prison and have the burglary and receiving stolen property counts dismissed in exchange for his agreement to testify truthfully at trial and to cooperate with the prosecution.

(CT 891-97.) In addition to Spohn's written agreement to testify, William Moore and Kristi Cribbs, aka Kristi Wise, who were found to be accessories, also executed written agreements to testify. (Lodgment No. 22, Supplemental Clerk's Transcript at 17-29.)

A joint trial of Petitioner, Ward and Potts began on August 23, 1999, during which Petitioner and Potts pleaded no contest to receiving stolen property and had the robbery count against them dismissed, and Ward had the receiving stolen property count against him dismissed. (CT 1018, 1046.) On October 14, 1999, the jury found Petitioner guilty of first degree murder and first degree burglary, and found both special circumstance allegations true. (CT 1085, 1088.) The jury made the same findings with respect to Ward and Potts, and Ward was additionally found guilty of first degree robbery. (CT 1062-63.) On October 22, 1999, in a separate proceeding, the jury recommended a sentence of life without the possibility of parole for all three defendants. (CT 1072.) The jury inserted a handwritten request in the margin of Petitioner's special verdict form asking the court to "consider leniency" as to Petitioner, but did not do so with respect to Ward or Potts. (CT 1074.) On April 10, 2000, the trial court struck the special circumstance allegations with respect to Petitioner, finding that although sufficient evidence existed to support the jury's finding that Petitioner was an aider and abetter in felony murder, there was insufficient evidence that Petitioner intended to kill the victim or that he acted with reckless indifference to human life. (Lodgment No. 19, Reporter's Transcript ["RT"], vol. 25, 4/10/00 at 29-30.) Petitioner was sentenced to a state prison term of twenty-five years to life on the murder count, along with concurrent terms of four years and two years respectively for the burglary and receiving stolen property counts. (CT 1408-15.) Ward and Potts were both sentenced to life without the possibility of parole. (CT 1269, 1403.)

Petitioner appealed his convictions. (Lodgment Nos. 1-3.) His appeal was consolidated with the appeals of his co-defendants, and the state appellate court affirmed the convictions in all respects, other than directing that Petitioner's sentence on the burglary and receiving stolen property counts run consecutively to his sentence on the murder count. (Lodgment No. 4, People v. Ward, et al., F035608, slip op. (Cal.Ct.App. Oct. 22, 2002) (unpublished memorandum).) A petition for rehearing was denied. (Lodgment Nos. 5-6.) Petitioner

1  thereafter filed a petition for review in the state supreme court. (Lodgment No. 7.) That petition

2  was consolidated with the petitions for review filed by Petitioner's co-defendants, and was

3  denied without a statement of reasoning or citation of authority. (Lodgment No. 8, People v.

4  Ward, et al., order (Cal. Jan. 15, 2003).)

5      On December 4, 2003, Petitioner filed a habeas petition in the trial court. (Lodgment No.

6  9.) That petition was denied on procedural grounds of: 1) untimeliness; 2) repetitiveness; and

7  3) failure to present claims on direct appeal which state law required to have been raised on

8  direct appeal. (Lodgment No. 10.) Petitioner filed a habeas petition in the appellate court on

9  March 11, 2004. (Lodgment No. 11.) That petition was denied on October 21, 2004, with a

10  single citation to Harris v. Reed, 489 U.S. 255, 263 (1989) (holding that "a procedural default

11  does not bar consideration of a federal claim on either direct or habeas review [in federal court]

12  unless the last state court rendering a judgment in the case 'clearly and expressly' states that its

13  judgment rests on a state procedural bar."). (Lodgment No. 12.) Petitioner filed a second

14  habeas petition in the appellate court on May 24, 2004, which was denied as duplicative of his

15  previous habeas petition. (Lodgment Nos. 13-14.) He filed a third habeas petition in the

16  appellate court on June 7, 2004, which was also denied as duplicative. (Lodgment Nos. 15-16.)

17  Petitioner filed a habeas petition in the California Supreme Court on November 8, 2004, which

18  was denied on February 22, 2006, without a statement of reasoning or citation of authority.

19  (Lodgment Nos. 17-18.)

20                                          **III.**

21                                  **UNDERLYING FACTS**

22      The following statement of facts is taken from the appellate court opinion on direct

23  review. This Court gives deference to state court findings of fact and presumes them to be

24  correct. See Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to

25  factual findings of both state trial and appellate courts). The Court will conduct a more thorough

26  examination of the record with respect to Petitioner's sufficiency of the evidence claim.

27          On February 6, 1998, Jennings' neighbor, Roger Bodine, was concerned
            because Jennings had not shown up for dinner the previous evening as planned.
28          Bodine went to Jennings' house around noon and saw the door was open. There
            was blood on the doormat and surrounding areas. When Bodine stepped inside

-4-                                                            06cv0463

the house, he saw more blood on the carpet, stair railing and a chair, and a bloody handprint was visible on the wall. After searching the house and not finding Jennings, Bodine called the sheriff's department.

When investigators arrived, they found the house in disarray. Cabinets and drawers were open, and an upstairs bedroom appeared to have been ransacked. Drag marks were visible on the stairs leading from the basement to the kitchen. The carpet in the house was saturated with blood and the telephone line pulled out. A computer in Jennings' office revealed his Internet connection had been terminated at 7:12 p.m. the evening before. A button and a small spring from a lock cylinder were found in the living room. The spring was later determined to have come from a generic version of the steering wheel locking device known as The Club (hereafter the club) and which was later found in a field. Missing parts from the club's cylinder component matched the recovered spring.

Jennings' body was located in the orange grove on his property. One of Jennings' handguns was found two to three feet from his body. Also recovered near the body were pieces of duct tape and a blanket with tape stuck to it. Nothing indicated Jennings had been dragged to the site where his body was found.

Jennings sustained approximately 14 blunt trauma injuries to his head, two of which were forceful enough to fracture his skull. In addition, there were approximately 18 additional traumatic injuries to his body. Some of the wounds revealed a circular pattern consistent with the cylinder on the club. The pathologist opined Jennings could have survived several minutes to one-half hour after the blows were inflicted.

A number of items were missing from Jennings' house: credit cards, a gun, a rifle, a sword, and a safe from the basement. The safe contained coin collections, certificates, and baseball cards. Some of the items were taken from the bedroom of Jennings' son, Michael.

Marijuana plants and evidence of marijuana cultivation were found in the garage. No methamphetamine was located on the property. Michael Jennings testified his father never used methamphetamine and abhorred the drug. Jennings' blood was analyzed and no trace of alcohol, marijuana or methamphetamine was present.

Potts knew Jennings and had worked for him in 1992 and 1993 but was then fired. From 1993 to 1995, Potts had asked Bodine about Jennings' safe approximately a dozen times. Potts wanted to know if the safe was accessible by crawling under the house or if Bodine could obtain a key or the code to the burglar alarm.

Following his arrest in Arkansas, Spohn gave two separate statements to investigators. After accepting an agreement in which he pled guilty to second degree murder, Spohn testified at appellants' trial. Spohn testified that Ward picked him up at his house about 5:00 p.m. on February 5, 1998. Ward told Spohn he could use his help in collecting some money, and Spohn agreed to go along. Spohn testified the money was payment for methamphetamine that Ward previously delivered to Jennings. Spohn admitted that when he was first questioned by investigators, he said Ward had indicated the money was for a gambling debt and that he had no idea drugs were involved. Spohn and Ward drove around for a period of time looking for Potts. They eventually located Potts and Blunt at a bar.

Spohn testified he, Potts, Ward, and Blunt had all used methamphetamine that day. Eventually, they all got into Ward's car and Ward asked the others if they were "ready to go do this." Potts directed the way to Jennings' house. When they arrived at Jennings' house, Ward went to the front door. Jennings answered the door and spoke to Ward for a brief time. Ward then returned to the car to get a small bottle of bleach, which was to be used to test the quality of the methamphetamine Jennings had purchased earlier. Spohn admitted he had not mentioned anything about drugs when talking to detectives in Arkansas, and in fact, had stated Jennings did not know Ward or Spohn and had no idea why they were at his house.

Spohn testified that Jennings then pointed a gun at Ward. Again Spohn acknowledged that in his first statement, he did not say anything about Jennings having a gun. Spohn testified he got out of the car and Jennings turned the gun toward him. Ward then threw the bleach in Jennings' face and was able to get the gun away from Jennings. Spohn struggled with Jennings and Ward threw Jennings' gun in the car. Ward got his club from the car and struck Jennings on the side of the head. Jennings was screaming and yelling threats while he continued to struggle with Ward. Ward hit Jennings again with the club. Spohn acknowledged that in his Arkansas statement, he reported that Jennings told the men he did not want to die and pleaded with them to stop hitting him and to take whatever they wanted. Also in his initial statement, Spohn stated Ward struck Jennings approximately 11 times in the head and described it as a "sick scene." At trial, Spohn testified Ward hit Jennings "maybe five to ten times," and only when Jennings "got out of hand." Eventually, duct tape was used to bind Jennings and a blanket was draped over him. Spohn testified he did not see how that occurred.

While Spohn and Ward attacked Jennings, Potts got out of the car. Spohn testified Blunt was standing by the car when Potts approached and told Ward he knew where Jennings' money was. Spohn claimed Blunt did not participate in either beating Jennings or in taking property from the house. Spohn testified Ward and Potts went into Jennings' house and then returned with the safe.

In his earlier statement, Spohn had said Blunt was out of sight and that Potts and Blunt had rolled the safe out of the house. Spohn also admitted in his earlier statement that he said Blunt had taken a gun from the house and put it in the car, and also that he told the officers Potts and Blunt came out of Jennings' house with a "bunch of property." Spohn explained the contradiction in his statements by claiming that at the time of his first statement, he thought his codefendants had "rolled" on him, and he was trying to implicate all of them.

After Ward loaded the safe in the car, the men got into the car and drove away. Spohn testified that when they left, Jennings was on his hands and knees by the front door, having difficulty breathing. As they were driving, Spohn tossed the bloody club and the gun from the car. At trial, Spohn testified Ward got rid of the gun, but in his earlier statement he said Blunt threw the gun and club from the car.

As they were driving, Ward asked Spohn if he knew anyone in Porterville. Spohn told Ward he knew Kristi Wise (Wise) [footnote: Wise is also referred to as Kristi Cribbs], whom he had sold dope to for a couple of months and had attended a "bail skip" with. Ward drove to Wise's house, knocking down a fence so he could park in the back yard without being visible from the street. Wise was not at home, so Spohn paged her and also called Josh Sommerset and Joseph

Young. After awhile, Wise arrived at the house. Spohn took Wise aside and told her he was in trouble.

Someone brought the safe into Wise's house, and several people used a crowbar to open it. At trial, Spohn testified Ward and Sommerset worked on the safe, but in his earlier statement, Spohn had said Potts and Blunt used a crowbar on the safe. Wise testified that Ward tried to help Blunt open the safe, but Potts was in another room holding a black bag between his legs. Wise testified that Ward told her "they" had been in a fight and the police were chasing them.

The safe contained silver coins in books, rolls of coins, silver certificates and other odds and ends, including cigarette lighters and cufflinks. The contents of the safe were placed into plastic bags. One bag was left at Wise's house and the other was put in the trunk of her car. While they were at Wise's house, Spohn noticed other property which had been taken from Jennings' house, including a 30/30 rifle and a sword. Spohn and Ward changed their bloody clothing and Spohn told Ward they needed to get out of there.

From Wise's house, the group split up into two cars and went to Jay Young's house. There, the items were retrieved from the trunk of Wise's car and dumped onto a pool table in the garage. Ward and Potts argued about the fact that nothing of apparent value was found in the safe. Ward stated, "'This could be worth a million dollars. It's worthless to me. I need my money or dope, not a fucking coin collection.'" Spohn testified that everybody took some of the safe contents, but admitted he had earlier reported that Potts was in charge of dividing the property. Wise testified that Ward, Potts, Blunt and Spohn all picked through the items. She testified Blunt and Potts told her she could keep the 30/30 rifle taken from Jennings' house.

The following morning, William Moore picked up Ward about 6:00 a.m. Moore testified he and Ward first went to where Blunt and Potts were staying and then drove to Wise's house. Blunt also drove to Wise's house. At Wise's, Moore overheard Ward and Blunt ask Wise about a bag of items they left there the night before. Wise told them she did not know what happened to the bag. Ward was angry about the missing bag, but Blunt said he had gotten most of his stuff earlier so it didn't matter.

When Blunt, Ward and Moore left Wise's house, they drove separately to a gas station where all three men used Jennings' credit card to buy gas before splitting up. A couple of days later, Moore met Ward again and the two used Jennings' credit card to buy merchandise, including stereo equipment, tools, and clothing from a number of stores in town. Moore, Spohn, Ward and several other people also used Jennings' credit card at Table Mountain Casino, where they purchased food and attempted to get cash to gamble. Videotapes from the casino and a gas station, as well as credit card records, were introduced into evidence to corroborate Moore's testimony.

Later Moore had an accident in which he wrecked and then abandoned Ward's car. When Ward and Moore found out the car had been impounded, Moore went to the storage yard to retrieve some of Jennings' silver dollars, which were in the car. Ward went later to pay to have the car released. Following Ward's arrest, the car was searched and a piece of the club was recovered from it. The main portion of the club was located in a field to which Spohn directed officers.

Some of Jennings' property was recovered during the course of the investigation. Jennings' safe was pulled from a river a month after the incident. About 20 newly purchased items corresponding to the property purchased with Jennings' credit card were found in Ward's house. Also found in Ward's house were a Maltese cross and silver coins taken from Jennings' house. Personalized lighters and a silver certificate were found at Sommerset's house. Potts and Blunt were together when they were arrested. Neither had any of Jennings' property in their possession at the time.

Defense

Blunt's mother and girlfriend both testified. Both stated that to their knowledge, Blunt did not own firearms. Blunt's girlfriend acknowledged she had only known Blunt for approximately two months before the murder occurred.

Attorney William Logan testified on behalf of Ward. Logan, who had been a defense attorney in "thousands" of drug cases, opined that the marijuana seized from Jennings' house had been cultivated for sale. Logan testified it was common for marijuana growers to also sell methamphetamine. Logan did not know Jennings and conceded there was no physical evidence of methamphetamine use or sale at Jennings' house.

Ward testified in his own behalf. He testified he had known Spohn for about four months, Potts for about a month, and met Blunt the day before Jennings was killed. Ward claimed Potts told him on several occasions that a "friend" wanted to buy methamphetamine, and that on February 4, he and Potts delivered a large quantity of the drug to Jennings. Ward testified Jennings paid $10,000 up front, which was half of the money owed, and he agreed to pay the rest later. The following morning, Ward wanted to collect the rest of the money, so he contacted Spohn, Potts and Blunt. Ward testified he did not intend to rob, steal from or kill Jennings.

According to Ward, when the four arrived at Jennings' house, Jennings met them at the door and complained about the quality of the drugs he had received. Ward stated he went to get a bottle of ammonia to test the drugs, but when he again approached Jennings, he pulled a gun on him and threatened to kill him. Ward testified that at some point he was able to squirt some ammonia in Jennings' face and grab his arm. During the struggle between Ward and Jennings, Ward saw Spohn approach with the club. Spohn swung at Jennings, missed and instead hit Ward in the head. When Ward regained his senses, Spohn was still swinging the club at Jennings, and Jennings' gun was on the floor. Ward took the gun to the car and then returned to Jennings, telling him he only wanted his money or the drugs. When Jennings refused, Potts (who had been waiting in the car) told him he knew where the money was, so he and Potts went to the basement and took the safe. According to Ward, Spohn was afraid Jennings would call the police so someone pulled the telephone line before they left. Ward admitted taking Jennings' passports and credit cards which were in the safe, but denied going through the cupboards and drawers or entering Jennings' son's room. [¶] Neither Potts nor Blunt testified.

(Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 3-9.)

/ / /

06cv0463

# IV.

## PETITIONER'S CLAIMS

Petitioner contends that his rights under the California and United States Constitutions, and under California statutory provisions, were violated in the following manner:

(1) The state appellate and supreme courts ignored his claim presented on direct appeal alleging that the jury was improperly allowed to consider Spohn's in-custody Arkansas statement as substantive evidence of guilt, thereby depriving him of a state-created, federally-protected liberty interest in state appellate procedures without due process of law. (Memorandum of Points and Authorities attached to Petition ["Pet. Mem."] at 12-15.)

(2) Petitioner was denied the effective assistance of counsel because his trial counsel failed to object to the admission of Spohn's in-custody Arkansas statement on the basis that it was involuntary and/or obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and failed to introduce evidence supporting such an objection. (Pet. Mem. at 16-32.)

(3) The prosecutor committed misconduct by calling Spohn to testify at trial knowing he would testify falsely, for the improper purpose of providing a basis for introducing his Arkansas statement as impeachment, and the trial court ratified the prosecutorial misconduct by sentencing Spohn to the agreed upon sentence of fifteen years to life. (Id. at 32-38.)

(4) Petitioner was denied the effective assistance of counsel because he was required to sit five feet behind his trial counsel and was prevented by the courtroom deputies from leaning forward to consult with counsel during trial. (Id. at 38-42.)

(5) Petitioner was denied the effective assistance of counsel because his trial counsel failed to object to misconduct by the prosecutor in connection to the presentation of Spohn's testimony, and during the prosecutor's closing argument. (Id. at 42-45.)

(6) Petitioner was denied the effective assistance of counsel because his trial counsel lied to him when he said that the court had denied his motion for substitution of counsel, and because the trial court failed to conduct an adequate hearing on that motion. (Id. at 45-47.)

(7) Petitioner was denied the effective assistance of counsel because his trial counsel failed to: (a) interview witnesses; (b) follow up on leads provided by Petitioner and police

investigators; (c) challenge the admissibility of Spohn's in-custody Arkansas statement; and (d) conduct adequate legal research in preparation for trial.  (Id. at 47-51.)

(8)  Petitioner was denied his right to confront and cross-examine Spohn and Kristi Wise by the introduction of double hearsay testimony of a detective who testified that Wise told the detective that Spohn had told her that Petitioner and Potts cleaned out the victim's house while Spohn and Ward fought with the victim.  (Id. at 51-78.)

(9)  The jury was erroneously instructed to view with distrust accomplice testimony favorable to the defense.  (Id. at 79-92.)

(10)  The trial court erred in failing to sua sponte instruct the jury that they had a duty to determine whether Kristi Wise and William Moore were accomplices.  (Id. at 93-104.)

(11)  Petitioner was denied the effective assistance of counsel because his appellate counsel failed to present grounds eight though ten presented here to the state supreme court in a petition for review.  (Id. at 105.)

(12)  Petitioner was denied the effective assistance of counsel because his appellate counsel misrepresented that he would file a state habeas petition, incorrectly opined that filing a state habeas petition would be a meaningless exercise, and incorrectly advised Petitioner there was no time limit to filing state habeas petitions.  (Id. at 106-12.)

(13)  Insufficient evidence supports the verdicts, and the state court's opinion to the contrary is based on an unreasonable determination of the facts.  (Id. at 113-49.)

(14)  The convictions were founded entirely upon decisions and actions by the prosecutor which must be deemed to be misconduct.  (Id. at 150-55.)

(15)  Petitioner's sentence of twenty-five years to life, which is in effect a sentence of life without the possibility of parole, is disproportionate to his culpability and constitutes cruel and unusual punishment.  (Id. at 156-63.)

(16)  The cumulative effect of the trial errors resulted in prejudice, and an evidentiary hearing is necessary in order to address this claim.  (Id. at 164.)

/ / /

/ / /

# V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner's claims do not merit habeas relief and the Petition is **DENIED**. The Court **ISSUES** a Certificate of Appealability limited to grounds two, three and thirteen.

**A.    Standard of Review.**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (1)-(2) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. An unreasonable application may also be found, "if the state court either unreasonably extends a legal principle

-11-                                                                    06cv0463

from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412.

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." 28 U.S.C.A. § 2254(d)(2) (West 2006). In order to satisfy this provision, a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming they rest on a factual determination, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.      Petitioner is not entitled to habeas relief as to ground thirteen.**

The Court will first address Petitioner's claim that insufficient evidence was adduced at trial to support the verdicts, as it will aid in addressing the remaining claims. In ground thirteen, Petitioner contends there was no tangible evidence implicating him in the victim's death, other than the in-custody Arkansas statement of Spohn which Spohn disavowed at trial, and arguably the statements of Wise and Moore. (Pet. Mem. at 113.) Petitioner argues that the evidence universally showed he was merely a bystander during the attack on Jennings and the taking of property from his house, that he was shocked at what took place, and there was no evidence whatsoever demonstrating that he accompanied Spohn, Ward and Potts to Jennings' house with knowledge of any purpose other than to collect a debt. (Id. at 131-32.) He contends the evidence showed at most that he engaged in criminal activity only after Jennings was attacked, thereby supporting a finding that he was an accessory, and not an accomplice as found by the jury. (Id. at 133-35.) Rather, he argues that the evidence showed that he and the other three men went to Jennings' house to collect a debt, that Ward and Spohn attacked Jennings in self-

defense after Jennings pulled a gun, and that any property taken from his home was not a burglary or a robbery but an attempt to satisfy the debt. (Id. at 135.) He argues that the evidence was insufficient to convict him of felony murder because there was no evidence he formed any criminal intent until after Jennings was attacked, and no evidence he removed property from Jennings' home with criminal intent. (Id. at 135-49.)

Respondent contends that the adjudication of this claim by the state appellate court on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. (Ans. Mem. at 67-71.) Respondent argues that because the United States Supreme Court has never held that the federal Constitution forbids the use of prior inconsistent statements as substantive evidence of guilt, Petitioner's attempt to eliminate Spohn's Arkansas statement, which by itself was enough to support the jury's verdict, is unavailing. (Id. at 70.)

Petitioner presented his sufficiency of the evidence claim to the state supreme court in a petition for review on direct appeal. (Lodgment No. 7 at 6-11.) That petition was summarily denied without a statement of reasoning or citation of authority. (Lodgment No. 8.) Petitioner presented the same claim to the appellate court on direct appeal. (Lodgment No. 1 at 8-42.) In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision. The Court will look through the silent denial by the state supreme court to the appellate court opinion, which denied the claim stating:

> Blunt contends there was insufficient evidence to find he was an accomplice in the robbery and burglary, and therefore, the resultant murder of Jennings. As argued by Blunt, "There was no tangible evidence of any kind to implicate (him) in the events surrounding the death of Byron Jennings." We disagree.

> An accomplice is liable as a principal if he or she promotes, encourages, or assists the perpetrator and shares the perpetrator's criminal purpose. (§ 31; People v. Sully (1991) 53 Cal.3d 1195, 1227.) When sufficiency of the evidence is challenged on appeal, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson, supra, 26 Cal.3d at p. 578.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the

circumstances might also be reasonably reconciled with a contrary finding. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Although this court must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. (*People v. Barnes* (1986) 42 Cal.3d 284, 303.) Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. (*Id*. at pp. 303-304.)

Here there is sufficient evidence to find that Blunt was an accomplice to the robbery and burglary of Jennings, and therefore, the resultant felony murder of him as well. Jennings sustained over 30 blunt trauma injuries. Spohn acknowledged that in his original statement, Jennings pleaded with his attackers to take what they wanted and he did not want to die. Jennings' house was ransacked, the phone line pulled out, and articles taken from throughout the house. There was no physical evidence that the crime resulted from a drug deal on which Jennings reneged. Spohn's initial statement to police established Blunt's culpability in the robbery and burglary by stating that Blunt and Potts removed the safe and cleaned out the house while Ward and Spohn beat Jennings.

The jurors had full opportunity to hear both versions of Spohn's testimony, and it was up to them to determine the credibility of a witness and the truth or falsity of the facts. (*People v. Barnes, supra*, 42 Cal.3d at p. 303.) Reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Redmond, supra*, 71 Cal.2d at p. 755.)

(Lodgment No. 4, <u>People v. Ward, et al.</u>, No. F035608, slip op. at 39-40.)

Because the claim was adjudicated on its merits in the state courts, habeas relief is only available if that adjudication was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented at trial. <u>Williams</u>, 529 U.S. at 405-07; <u>Miller-El</u>, 537 U.S. at 340. The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). In <u>Jackson</u>, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 324. In making this determination, habeas courts must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. <u>Id</u>. at 319. Once a state court fact finder has found a defendant guilty,

federal habeas courts must consider the evidence "in the light most favorable to the prosecution." Id. Federal habeas courts must also analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16.

The Ninth Circuit has stated that: "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005). In Allen, the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." Id. at 1274 n.12, quoting Early v. Packer, 537 U.S. 3, 8 (2002). The state appellate court here applied a standard similar to Jackson and similar to that applied by the state court in Allen (compare id. and Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 39), and this Court must similarly determine whether the state appellate court opinion here "reflected an unreasonable application of Jackson . . . to the facts of this case." Allen, 408 F.3d at 1275.

The evidence in this case came from three distinct sources: (a) physical and forensic evidence; (b) the testimony of Jennings' friends, family and neighbors; and (c) the trial testimony and out-of-court statements of the people present at the murder and involved in the distribution and use of the victim's property. This evidence clearly supports the finding by the state court that sufficient evidence exists to satisfy the substantive elements as defined by state law of burglary and felony murder with respect to Petitioner.

**1) Physical evidence and testimony of friends, family and neighbors**

Roger Bodine testified that he and Jennings were next door neighbors, friends, and fellow orange growers, and that he came to Jennings' house on February 6, 1998, about noon, after Jennings failed to answer repeated telephone calls. (Lodgment No. 19, Reporter's Tr. ["RT"] at 904-10, 930.) The front door was wide open, there was "an awful lot of blood" on the floor inside the house near the door, blood on a plant next to the stairs that lead up to the front porch, a bloody hand print streaking down the wall near a keypad for a burglar alarm, and it looked like

the house had been searched. (RT 911-23.) Bodine was aware that Jennings had a safe in the basement, that he owned a rifle, was in possession of a .357 caliber handgun which he had borrowed, and owned a small-caliber pistol which he kept in a desk drawer by the front door. (RT 925-26.) Bodine said that James Potts, one of Petitioner's co-defendants, had in the past hung around their neighborhood, had occasionally worked for Jennings, and had stored equipment at Bodine's house. (RT 926-27.) Bodine said that between 1994 and 1995, Potts asked Bodine over a dozen times about Jennings' safe, including whether the safe could be accessed from underneath the house and whether Bodine knew Jennings' burglar alarm code. (RT 928-31.) The trial judge twice admonished the jury that Potts' statements to Bodine were admitted only as to Potts. (RT 929, 972.) Jennings' son testified that his father kept a .357 revolver in a zip-up case in a night stand in the upstairs bedroom, kept two .22 rifles in a kitchen closet, and always maintained his house in a very neat condition. (RT 2121, 2125-26.)

The police arrived and found a baseball cap in a flowerbed with a white envelope next to it, eyeglasses in the driveway, drag marks on the tile leading from the basement, and telephone wires pulled out of a box on the outside of the house. (RT 977-80.) The house appeared to have been ransacked, and in the room just inside the front door there were large amounts of blood on the carpet and furniture, and an empty spool of duct tape. (RT 980-82.) The police found fifty-four marijuana plants growing in Jennings' garage, and sixty smaller marijuana plants growing in his basement. (RT 993-94, 1125-28.) Jennings' body was found face down in the mud beneath an orange tree in an orchard next to his house, with a small-caliber handgun lying near his hand. (RT 994-97, 1124.) Jennings had suffered at least eleven blows to the head with a heavy object consistent with an automobile steering wheel locking device referred to as the Club, which was later located by the police, and Jennings had about eighteen additional injuries to the rest of his body. (RT 1158-59.) The cause of death was multiple skull fractures due to blunt trauma to the head. (RT 1164-73.) There was no indication that Jennings was alive when he was in the mud in the orchard, and he probably lived only few minutes, or at most a half an hour, after suffering his head injuries. (Id.)

-16-

One of Jennings' credit cards was used at a casino on February 12, 1998, and a security video showed Larry Ward, one of Petitioner's co-defendants, arriving at the casino in Ward's car with four other individuals named William Moore, Shelly White, Steve Flores and John Scott. (RT 1061-65.) Moore paid for a meal with one of Jennings' credit cards at the casino, and unsuccessfully attempted to obtain cash. (RT 1089.) Property belonging to Jennings was found during a search of the residences of Joseph Young and Joshua Sommerset, including lighters and vintage United States currency. (RT 1065-67.) The police found the Club used to kill Jennings in a field about seven miles from his house, which was missing its cylinder components. (RT 1070-72, 1441.) Some of the missing cylinder components were found near Jennings' front door. (RT 1077.) Merchandise purchased with Jennings' credit cards after his death and property taken from his home were found in Ward's house. (RT 1078-79.)

**2) Testimony of Randy Spohn**

Randy Spohn, originally a co-defendant in this action, testified at trial pursuant to an agreement with the prosecution in which he was allowed to plead guilty to second degree murder in exchange for testifying truthfully at trial. (RT 1466-67.) Spohn testified that he had given two statements to the police, both of which were recorded, one on March 28, 1998, when he was in custody in Arkansas, which, as discussed below, implicated Petitioner, and the other on September 10, 1999, to a prosecution investigator, which was generally consistent with his trial testimony. (RT 1467, 1671-74.) Spohn, who was six feet tall and weighed about two hundred and forty pounds at the time, testified that on February 5, 1998, Ward asked him to help him collect some money. (RT 1471-42.) The jury was admonished throughout Spohn's testimony that statements which Spohn attributed to any one co-defendant were admitted only as to that co-defendant. (RT 1471-72, 1478, 1496, 1509-10, 1579, 1618, 1624, 1648, 1701, 1720, 1736, 1782.) Spohn agreed to go along, and they drove around in Ward's car looking for Potts, someone Spohn had never met. (RT 1472.) They found Potts at a bar in the company of Petitioner, whom Spohn also had never met. (RT1473-74.) Spohn sat in the car outside the bar as Ward went inside and had a conversation with Potts and Petitioner which lasted about fifteen minutes. (RT 1475.) Potts and Petitioner followed Ward and Spohn to a house where Potts and

06cv0463

Petitioner parked their vehicle and approached Ward's car. (RT 1477.) Ward said to Potts: "Well, you ready to go do this?", to which Potts said "yes", and Ward replied "okay." (Id.) Potts asked Ward who Spohn was, to which Ward replied: "Well, he's with me," and Potts said: "We'll need him, he's going to know me." (Id.) All four men got into Ward's car; Ward was driving, Spohn was in the front passenger seat, Potts was in the back seat behind Ward, and Petitioner was sitting behind Spohn. (RT 1476-77.) They drove to Jennings's house with Potts providing directions. (RT 1483.)

Spohn testified that when they arrived at Jennings' house it was dark outside, and Ward pulled into the driveway and parked a few feet from the front porch. (RT 1484.) Ward left the car running, went up the steps to the front porch, and was met at the door by Jennings. (RT 1487.) The porch light was on and Jennings was standing in the frame of the open front door. (RT 1487-88.) Ward and Jennings spoke for a few minutes, after which Ward came back to the car and turned off the engine. (RT 1488-89.) Ward told everyone in the car that Jennings wanted him to test the dope again, and Spohn watched Jennings as he went back inside his house and came out holding a gun. (RT 1490-91.) Ward took the keys from the ignition and opened the trunk while Potts, Petitioner and Spohn remained in the car. (RT 1489.) Ward then walked back up the stairs to the front porch with a small bottle of ammonia or bleach in his hand, which Spohn said he and Ward kept handy in order to test methamphetamine. (RT 1489-91.) Ward told Jennings: "Get the dope, we'll test it again." (RT 1491.) Spohn was watching from the car and was stunned to see that Jennings was holding a .357 magnum handgun, so Spohn asked Potts: "What the hell is this? What the hell is going on?" (RT 1494-95.) Potts said he did not know what was going on. (RT 1496.)

Spohn got out of the car and walked a couple of feet towards the steps which led up to the porch, at which point Jennings pointed the gun at him and asked if he wanted to die. (RT 1496-97.) At this point Spohn was stopped at the bottom of the stairs, Ward was halfway up the stairs, and Jennings was in the door frame looking back and forth between Ward and Spohn. (RT 1497-98.) Spohn moved up a little and said: "Hey, man, this ain't got to happen, you know." (RT 1498.) Jennings "racked the gun straight up at" Spohn and looked as if he was

about to fire.  (Id.)  Ward then threw the bleach or ammonia into Jennings' face.  (Id.)  Jennings dropped his head and Ward grabbed the gun.  (RT 1499.)  Ward and Jennings struggled for a few minutes, after which Ward took the gun away from Jennings, brought it down the stairs and put it in the car.  (Id.)  Spohn said he did not know if Potts and Petitioner were still in the car at that point, but he assumed they were because he did not see them outside the car.  (Id.)

Spohn testified that he then approached Jennings, shoved him against the door, and began fighting with him.  (RT 1500.)  Jennings was very strong and was getting the better of Spohn in their fistfight.  (Id.)  Ward came back up the stairs with the Club and told Spohn to watch out. (RT 1501.)  Ward struck Jennings on the head with the Club as Spohn ducked out of the way. (Id.)  Jennings fell down in front of the door and Ward told him: "Hey, I need my money, I want my money or my dope," to which Jennings replied: "Fuck you, the dope is no good, you ain't getting shit."  (RT 1502.)  Ward told Jennings: "Hey, it ain't got to be like this.  I want my money or dope and leave," to which Jennings replied: "You ain't getting shit."  (Id.)  Jennings got up, charged Spohn and Ward, and said he was going to get his gun and kill them.  (Id.) Ward hit Jennings in the head with the Club again which caused Jennings to go down again. (RT 1503.)  Jennings attempted to go for an alarm when Ward and Spohn pulled him back.  (Id.) Ward said to Spohn: "What the hell we going to do now?"  (Id.)  Jennings then pulled Ward inside the house and shut the door with Spohn still outside on the porch.  (Id.)

Spohn said the front door was locked, and that he watched through the window and listened from the porch as Ward and Jennings fought and struggled inside the house.  (RT 1504.) Jennings was attempting to get something out of a desk drawer while laughing and saying that Ward and Spohn were going to die in a matter of days.  (RT 1504-05.)  The fight lasted about five minutes, after which Ward opened the door to allow Spohn in.  (RT 1505-06.)  When Ward opened the door, Spohn saw Jennings on his knees laughing and bleeding with his hands taped and covered with a blanket, and Ward said: "Fuck, he's not going to pay us the money."  (RT 1506-09.)  Potts then came up and told Jennings: "Hey, you owe him the money.  You need to pay him the money you owe for the drugs," but Jennings said: "Fuck you guys.  You ain't gettin' shit."  (RT 1506–07.)  Spohn said Petitioner was still in the car at this point.  (RT 1507-08.)

-19-

When Ward told Potts that Jennings owed him money for drugs, Potts replied: "I know he's got it here" and: "I probably know where the money is at." (RT 1510.) Spohn testified that at this point Petitioner was standing beside the car, and that Ward asked Potts where Jennings keeps his money. (Id.) Spohn did not hear Potts' reply, but saw Ward enter Jennings' house through the front door and watched as Potts went around the outside of the house toward the back. (RT 1510-12.) Spohn was standing over Jennings at this point to make sure he did not go for the alarm again. (RT 1512-13.) Ward eventually came around from the back of the house rolling a safe. (RT 1515.) Ward put the safe in the trunk of his car while Petitioner was standing beside the car looking scared. (RT 1518, 1521.) Spohn also said he was standing a few feet inside the house monitoring Jennings and was not aware of what Petitioner was doing during that time. (RT 1522.) Spohn heard Jennings say: "I don't owe you guys anything", but did not recall Jennings saying anything like: "Don't hurt me" or: "Take what you want." (RT 1526.)

Spohn testified that he saw other property belonging to Jennings in the trunk of Ward's car in addition to the safe, including a sword and a rifle, but did not see how those items got there. (RT 1524.) Ward shut the trunk a few seconds after he put the safe in, and Petitioner was the first one to get back into the car. (RT 1525.) As Potts got back in the car, Ward told Jennings: "Hey, it didn't have to be like this. If you don't got the money or the dope, if it got burnt, just tell me, we can handle it. All I wanted was the money or my dope." (Id.) Spohn and Ward then got in the car and they all drove off. (Id.) Jennings was on all fours with his hands in front of him by the front door when they left. (Id.) Although Jennings told Spohn that he could not breath, Spohn told him not to worry, because Jennings did not look to be "hurt that bad." (RT 1525-26.) Spohn picked up the Club used to beat Jennings, carried it on his lap in the car and threw it out the window after they had driven a few miles. (RT 1534.) After they passed a Sheriff's car, Ward threw Jennings' .357 magnum out of the car. (RT 1536.)

Spohn testified that when they passed a second Sheriff's car they became paranoid, so Ward asked Spohn if he knew anyone who lived nearby. (RT 1637-38.) Spohn directed him to the house of Kristi Wise, someone Ward had met once or twice. (RT 1538.) Ward pulled

06cv0463

into Wise's carport, and Spohn went inside as Ward pulled the car into the backyard. (RT 1539-40.) Wise was not home, and the only person there was Brent Clems who left immediately because he did not get along with Spohn. (RT 1541-42.) Potts, Ward and Petitioner then came inside and waited as Spohn paged Wise. (RT 1542, 1545.) Ward went back outside with either Potts or Petitioner while Spohn called Josh Summerset and Joseph Young, and when Spohn got off the telephone, the safe was in Wise's bedroom. (RT 1546.) Wise and Vance Overcash then arrived at the house. (RT 1547.)

Spohn said he grabbed Wise and pulled her aside while Overcash was getting a baby out of the car, and told her: "I'm in some trouble here for a second." (RT 1572.) Spohn pulled Wise into the bedroom with Ward and Ward shut the door. (RT 1573.) Spohn said that either Petitioner or Potts was in the bedroom with them. (Id.) Spohn admitted that he said something to Wise but could not remember what he had said, other than that he was in some trouble. (RT 1574.) Spohn said he could not remember for sure, but he thought that Ward might have admitted to Wise that he had been involved in a heist. (RT 1578-79.) Wise produced a tire tool with which Ward attempted to pry open the safe. (RT 1581-82.) Summerset and Young arrived at the house, and Summerset came in the bedroom and tried to pry open the safe while Young stayed outside. (RT 1582.) The sword and rifle taken from Jennings' house were also brought into Wise's house. (RT 1592-93.)

The safe contained a coin collection along with assorted odds and ends such as cufflinks, paperwork and a few lighters. (RT 1584-85.) The contents were placed in two plastic bags. (RT 1586.) One bag was placed in the trunk of Wise's car and the other left at her house. (RT 1587.) Spohn said he and Ward both changed their clothes, and Spohn said he might have asked Wise to burn the clothes he had been wearing that night. (RT 1587-90.) By the time Spohn changed his clothes, the people at the house included him, Ward, Potts, Petitioner, Overcash, William Moore, Chris Ballard, Stephanie Chester, Daniel Ellis, a person named Vanessa, and perhaps Brent Clems. (RT 1591.) They all wanted to know what was going on, so Spohn told Ward: "Hey, we got to get out of here." (RT 1592.) Between fifteen and thirty minutes after changing clothes, Spohn, Ward, Potts and Petitioner left Wise's house. (RT 1595.)

-21-

Ward put a bag of Jennings' property in the trunk of Wise's car along with the sword, while the other bag of property was left at Wise's house along with the rifle. (RT 1595-97.) Spohn, Potts and Petitioner got into Wise's car with Wise driving, and Ward got in Young's car with Young driving and with Summerset and Young's girlfriend Tanya as passengers. (RT 1597-98.) They all drove to Young's house. (RT 1600.)

Spohn testified that when they arrived at Young's house, Spohn brought the bag of Jennings' property into the garage and dumped it out on a pool table, and that someone brought the sword into the garage. (RT 1604.) Ward said of the property: "This could be worth a million dollars. It's worthless to me. I need my money or dope, not a fucking coin collection," so everyone picked though the property "like a bunch of vultures" and took what they wanted. (RT 1609-10.) Spohn, Ward, Wise and Young all took some items, but Spohn said he did not see Potts or Petitioner take anything. (RT 1611.) William Moore came to Young's house and picked up Ward. (RT 1614-15.) Spohn said he later heard that Ward and Moore ended up with Jennings' credit cards and had used them to buy gas, and had attempted to use them at a casino and at a Wal-Mart, even though Spohn said that he had warned them not to use the credit cards. (RT 1614-15.) Petitioner left with Spohn and Young and they dropped Petitioner off at a freeway overpass. (RT 1616.) Spohn said he took a few coin books and the cufflinks from the safe, and that he went back to his trailer home that night. (RT 1617, 1625.)

Spohn testified that a neighbor told him a couple of weeks after Jennings' death that the police were looking for him in connection to a murder, so he drove to Arkansas. (RT 1625.) He was in Arkansas for three days when he happened to run into Ward, and Spohn was arrested about a week later. (RT 1625-26.) Spohn wrote two letters to Kristi Wise while he was in custody. In one he stated that: "I'm not going down for Potts' evil scheme, you know, him and Larry put all this together, I found out later on." (RT 2216.) Spohn was subject to lengthy cross-examination by the defense attorneys for Ward, Potts and Petitioner. (RT 1627-1793.)

Throughout Spohn's direct testimony he was asked about inconsistencies between his trial testimony and the statement he gave while in custody in Arkansas. He admitted that in the Arkansas statement he did not mention that Jennings had pulled a gun (RT 1492), said that when

06cv0463

the fight between Ward and Jennings started, Potts and Petitioner had already gotten out of the car (RT 1507), that Ward had kicked Jennings when he was incapacitated (RT 1513), and that it was Potts and Petitioner who rolled the safe out of Jennings' house (RT 1516). Spohn also did not mention anything about drugs in his Arkansas statement (RT 1520), said that Potts and Petitioner were wearing gloves (RT 1523), that Petitioner was the one who threw the Club and Jennings' handgun out of the car (RT 1534-35), that Petitioner helped open the safe (RT 1583-84), and that it was Potts who was in charge of dividing up Jennings' property at Young's house (RT 1612). Spohn said in his Arkansas statement that Jennings said he did not know Ward and did not know why the men were at his house (RT 1520), that as soon as the fight started between Jennings and Ward it was obvious they were there for a "heist" and not to collect on a debt (RT 1521), and that Jennings said: "Don't kill me, whatever you guys want, I just don't want to die, don't let me die." (RT 1566.) Spohn testified at trial that when he was giving his statement in Arkansas he was angry and "pissed off" because he had heard that the others had "rolled on me" (RT 1513, 1566-67), said that he did not mention anything about drugs because he did not want the police to know that he was involved with drugs (RT 1520), and was "trying to make sure anybody but me used the crowbar" to open the safe (RT 1583).

Thus, Spohn's Arkansas statement clearly implicated Petitioner because Spohn said it was obvious, before Jennings was killed, that they were there for a heist, and that Petitioner wore gloves and participated in removing the safe while Jennings, who did not know why the men were there, was being murdered and was begging for his life. Petitioner is incorrect, however, that Spohn's Arkansas statement was the entire case against him. According to Spohn's trial testimony, Petitioner heard Potts say that they would need Spohn along because Jennings would know Potts. The jury was able to draw an inference from that statement that Petitioner did not go along thinking they were simply going to collect a debt from Jennings. Spohn's statement in his letter to Wise that he did not want to go down for the "evil scheme" put together by Ward and Potts, and his testimony that Petitioner, Ward and Potts had a fifteen minute discussion at the bar before they set out, also supported a finding that Petitioner went along knowing that they intended to take Jennings's property in a robbery or burglary. In addition, Spohn's testimony

showed that Petitioner was aware that Jennings had been disarmed before he was attacked with the Club, because, according to Spohn, Ward had brought Jennings' gun back to the car when he grabbed the Club. Because Petitioner was sitting in the back seat of the car directly behind Spohn, and had the same vantage point as Spohn, Petitioner was close enough to see Ward then return to the front porch and hit Jennings with the Club about eleven times, administering what turned out to be fatal blows. Spohn also testified that Petitioner was outside the car when Potts told Ward he knew where Jennings kept his money, and when Ward told Potts to get it.

There was evidence that Jennings kept the .357 handgun in an upstairs drawer which had been hastily opened, and that he kept the small caliber handgun which was found next to his body in a desk drawer by the front door. The jury could reasonably conclude that Jennings did not have time to go upstairs to get the .357 while Ward was getting the ammonia out of the trunk, but would have armed himself with the small caliber handgun from the desk near the door, and that Petitioner took the .357 when he was upstairs ransacking the house. This evidence was consistent with Spohn's Arkansas statement that Petitioner threw Jennings' gun out of the car. The physical evidence showed that the house was ransacked and the telephone line cut, and that property was taken from throughout the house which had no connection to a drug debt. Thus, although Spohn's Arkansas statement clearly implicated Petitioner as participating in the burglary while Jennings was being beaten to death, Spohn's trial testimony itself, in conjunction with the physical evidence, permitted the jury to draw reasonable inferences that Petitioner was aware that they were going to Jennings' house for a burglary or a robbery, and was aware that property was taken from Jennings' house in the course of a murder/robbery/burglary and not in satisfaction of a debt.

**3) Testimony of Larry Ward**

The trial testimony of Ward, although slightly different than that of Spohn, also supported a finding that Petitioner was not merely a bystander but was a principle in the murder and burglary. Ward testified that around the time of the murder he was selling drugs for a living and making about fifteen thousand dollars per month. (RT 2436-37.) About a month before the murder, he was introduced to Potts through Jeff Scott, a mutual friend. (RT 2432.) Ward said

06cv0463

he delivered five pounds of methamphetamine to Jennings the day before the murder in a deal which had been arranged by Potts, and which called for half the money up front and half the next day. (RT 2432-33.) Ward, Potts and William Moore drove out to Jennings' house that day, delivered the drugs, and Ward received ten thousand dollars from Jennings. (RT 2434-35.) Jennings told Ward that he had a partner who would come down the next day with the other half of the money. (RT 2436.) The deal provided that Ward would pay his supplier three thousand dollars per pound and sell it to Jennings for four thousand a pound, making five thousand dollars on the deal. (RT 2435.) Ward said that if something went wrong, such as losing the drugs, he would be in a very dangerous position if he was unable to pay his supplier. (RT 2437-38.)

Ward asked Spohn to go along the next day to collect the other half of the money because Spohn was in the same business, and because Ward did not want to go alone, a standard precaution for drug deals. (RT 2439-40.) Ward said he wanted Potts to go along because it was Potts' connection and Ward was not sure how to get back to Jennings' house. (RT 2440.) Ward was supposed to be at Jennings' house around noon, but they were late because they had to drive around looking for Potts. (RT 2439, 2498.) Ward and Spohn found Potts at a bar with Petitioner, and Ward and Spohn followed Potts and Petitioner to a place where Potts dropped off his vehicle. (RT 2441.) Potts and Petitioner then got into the car with Ward and Spohn and they drove to Jennings' house. (RT 2441.) Ward said his intention was not to rob Jennings, but to get the other half of his money, and that he did not have any reason to believe there would be trouble. (Id.)

When they arrived, Jennings came outside and met Ward on the front porch. (RT 2442.) Jennings was angry that Ward was late, and Ward told him it was because he had been looking for Potts. (RT 2443.) Jennings "cussed" Potts, and when Ward asked Jennings for the money, Jennings said there was a problem. (RT 2443-44.) Ward said that Jennings was concerned that the color of two of the pounds of methamphetamine was different than the color of the other three pounds, and that he wanted to test them. (RT 2444.) Ward agreed, turned off the car, told the passengers that the testing would take about half an hour, and retrieved a bottle of ammonia

1   from his trunk. (RT 2444-45, 2495.) Ward said that Jennings expressed concern as to who was

2   in the car, but Ward told him not to worry about it. (RT 2445.)

3           Ward had gotten halfway back up the stairs to the porch when Jennings pulled a gun,

4   pointed it at him, and asked him if he wanted to die. (RT 2446-47.) Ward put his hands up and

5   told Jennings this did not need to happen, but Jennings said the dope was no good, that Ward

6   did not know who he was messing with, and threatened to kill Ward. (RT 2447.) Ward said that

7   Jennings then looked away toward the car, and Ward took the opportunity to squirt ammonia in

8   his face. (Id.) Ward then ran up the stairs and grabbed the arm in which Jennings held the gun.

9   (RT 2448.) Ward was quite a bit smaller than Jennings and they began struggling near the open

10  front door. (Id.) Ward was yelling for help and Spohn came running with the Club in his hand.

11  (RT 2449.) Spohn swung the Club and knocked both Ward and Jennings into the house. (RT

12  2450.) Spohn had tried to hit Jennings but hit Ward instead. (Id.) When Ward regained his

13  senses he looked up and saw Spohn hitting Jennings with the Club four or five times. (RT 2451,

14  2476.) Spohn stopped hitting Jennings and apologized to Ward for having hit him. (RT 2452.)

15  Ward said he then took Jennings' gun out to the car and threw it on the front seat. (RT 2452.)

16  Ward went back into the house and confronted Jennings, asking him what was going on, to

17  which Jennings replied: "You don't know who you're dealing with. I'll kill you. The dope was

18  no good." (Id.) Ward told him this did not have to happen and to just give him the money or

19  the drugs, and told Jennings that if he had gotten burned they could maybe work something out.

20  (Id.) Ward said that Jennings said nothing in reply except: "Fuck you." (Id.)

21          Ward said he then went out to the car and spoke to Potts, who wanted to know what was

22  happening, and Ward told him he did not know and went back into the house. (RT 2454.) Ward

23  was inside the house speaking to Spohn when Jennings shoved Spohn out the door, pulled Ward

24  inside, and shut the door, which locked automatically. (RT 2454-55.) Ward and Jennings

25  struggled and wrestled for two or three minutes during which Jennings attempted to get into one

26  of the desk drawers. (RT 2455.) When Ward opened the front door, Spohn came back in with

27  the Club in his hands. (Id.) Ward said he did not put duct tape on Jennings' hands and feet, but

28

06cv0463

that Spohn must have done so, and must have used tape from inside the house because Spohn never went back to the car. (RT 2455, 2507.)

Ward went back to the car a second time and told Potts, who was "really freaking out," that Potts needed to talk to Jennings, so Potts went inside and spoke to Jennings. (RT 2452-53.) Ward stayed in the car and could not hear what Potts said to Jennings. (RT 2453.) Potts came back and told Ward that Jennings was not going to pay but that Potts knew where the money was. (Id.) Ward told Potts to go get it and waited in the car. (Id.) Potts returned a few minutes later and said he needed Ward's help. (Id.) Ward and Potts went to the back door, down into a basement and took a safe which Potts said contained the money. (RT 2454.) They rolled the safe out and loaded it in the car. (Id.) Ward then said "let's leave" but Spohn would not go because he was concerned that Jennings would call the police. (RT 2455-56.) Spohn wanted someone to cut the telephone line, so Ward asked somebody to do it, and either Potts or Petitioner cut the telephone line. (RT 2456, 2513.) Ward said they all then left without taking anything else from Jennings' house, other than a rifle which had been leaning against the back door which Ward took because he did not want to be shot at as they were leaving. (RT 2456-57.) The first time Ward heard that a sword had been taken from Jennings' house was at trial. (RT 2512.) When they left, Jennings was inside the house on his hands and knees yelling at them. (RT 2456.)

They were about a mile down the road stopped at a stop sign when a Sheriff's car shined a spotlight on them, and they sped off concerned that Jennings had called the police. (RT 2457-58.) Spohn threw the Club out of the car, and after they passed a highway patrol car Ward threw Jennings' handgun out the window. (RT 2458.) They went to Wise's house at Spohn's suggestion and brought the safe into her bedroom. (RT 2458-59.) Ward was disappointed to find nothing of real value in the safe, and its contents were put into only one bag, not two as Spohn had testified. (RT 2460.) That bag was placed in Wise's car and taken to Young's house where it was dumped out on a pool table. (RT 2461.) Ward said he took two passports and Jennings' credit cards that night, and that Spohn gave him some coins from the safe a couple of days later which Ward gave to Moore along with the passports and the credit cards. (RT 2461,

2492.) Ward said he personally used Jennings' gas credit card four times, was with Moore eight times when Moore used the gas card, that Ward used the other credit cards when he and Moore went shopping, and that Moore used one of the credit cards at a casino. (RT 2510-11.)

It was weeks later when Ward read in the newspaper that Jennings had been found dead in his orchard, which surprised him. (Id.) Ward said he had not been paying attention to where Petitioner was during the events at Jennings' house and did not know where Petitioner was at anytime during the entire incident. (RT 2471, 2474, 2476, 2478, 2480, 2512-13.) On cross-examination by Potts' counsel, Ward said that Jennings looked much worse in the autopsy photographs then he did when they left him at the house, and he could not account for the fact that William Moore's hat was found at the scene or why Jennings was found in the orchard. (RT 2485-89.)

Thus, the trial testimony of Spohn and Ward placed Petitioner at the scene of the attack on Jennings and the burglary of his home. The physical altercation between Jennings, Ward and Spohn took place only a few feet from Petitioner, and Petitioner witnessed either Ward or Spohn run up with the Club in their hand and administer eleven blows to Jennings' head. Petitioner is incorrect in his contention that this evidence established that he was surprised at how the events unfolded. Even assuming that Petitioner's contention is one reasonable conclusion which the jury could have drawn from the trial testimony of Ward and Spohn, there are a number of reasons why the jury was allowed to discount their testimony to find that Spohn and Ward were not only attempting to lessen their own culpability, but were attempting to lessen everyone's culpability. First, neither version could account for the fact that Jennings' home had been ransacked and property taken from throughout the house, and Ward could not account for the sword taken from the house, which Spohn said Ward placed in the trunk. Second, in both versions Jennings was left on the floor without severe injuries, but the physical evidence showed that he was so severely injured that he probably lived only a short time after being attacked. Third, Spohn testified at trial that Petitioner overheard Potts say they would need Spohn to come along because Jennings would know Potts, an odd statement if the purpose of the visit was to collect money owed in the ordinary course of a deal brokered by Potts, as Ward had testified.

Moreover, that statement by Potts was made immediately after Petitioner had been present during a lengthy discussion between Ward and Potts in the bar, which the jury could reasonably infer involved what Spohn later characterized as Ward and Potts' "evil scheme." Additionally, there was no evidence whatsoever that Jennings was a methamphetamine dealer or had any connection to the drug. Rather, the evidence supported the opposite conclusion, in that no methamphetamine or methamphetamine paraphernalia was found on the property, no trace of the drug was found in Jennings' blood, and Jennings' son testified that Jennings abhorred the drug and would not be around people who were around it. (RT 2143-44, 2160.)

Thus, the jury was entitled to discount Spohn's trial testimony that Petitioner was not an active participant in the crime. In addition, Ward did not testify that Petitioner was not an active participant, but stated that he was not aware of where Petitioner was throughout the events. Given the fact that Ward testified that he returned to the car several times, where he would certainly have seen Petitioner had he been there, and Ward's testimony that Petitioner may have been the one who cut the telephone line, his testimony supports an inference that Petitioner was an active participant. Moreover, Spohn said in his Arkansas statement that it was obvious they were there for a heist, that Petitioner had worn gloves and participated in removing property from Jennings' house while the murder was being committed, and that Petitioner had thrown the Club and the gun taken from the upstairs bedroom out of the car during their escape. Inconsistencies between trial testimony and prior statements are exactly the type of credibility determinations that this Court must assume were resolved in favor of the verdict. Jackson, 443 U.S. at 319. In addition, as Respondent points out, Spohn's Arkansas statement is more believable in many respects than his trial testimony. It is inexplicable that Spohn would not mention in the Arkansas statement that he and Ward killed Jennings in self defense after Jennings pulled a gun, but would instead gratuitously incriminate himself in first degree murder. In addition, Spohn did not mention anything about drugs in his Arkansas statement, and there was nothing other than Spohn and Ward's self-serving trial testimony which implicated Jennings in a methamphetamine deal. Moreover, the account in the Arkansas statement that Jennings begged for his life and begged them to stop beating him and take whatever they wanted, was,

06cv0463

1  particularly in light of the severity of his wounds, more believable than Spohn's trial testimony

2  that Jennings was laughing and taunting Spohn and Ward as they beat him to death, and refused

3  their simple offer to take back the bad methamphetamine and leave him alone.

4      As the appellate court noted, in order to find Petitioner guilt of felony murder, the

5  prosecutor was required to prove beyond a reasonable doubt that Petitioner promoted,

6  encouraged or assisted the perpetrator and shared the perpetrator's criminal purpose. (Lodgment

7  No. 4, People v. Ward, et al., No. F035608, slip op. at 39.)  The evidence discussed above was

8  sufficient to support the jury's finding that Petitioner was guilty of burglary and felony murder

9  because it allowed the jury to draw a reasonable inference that Petitioner went along knowing

10  they intended to rob Jennings or burglarize his home, and that Petitioner actively assisted by

11  taking property from Jennings' house and possibly cutting the telephone line while Ward and

12  Spohn were beating Jennings to death and preventing him from activating a burglar alarm.  The

13  jury could also reasonably find that even if Petitioner went along believing it was a drug deal,

14  Jennings was beaten to death and had his home burglarized after he refused to pay the money

15  or return the drugs, and that Petitioner was an active participant in that felony murder.

16      **4) Testimony and statements of Wise and Moore**

17      Additional evidence also implicates Petitioner as a direct participant in burglary and

18  murder, and tends to support a finding that the trial testimony of Spohn and Ward was an

19  attempt to minimize everyone's role.  Wise was charged with two felonies in connection to her

20  role, and testified pursuant to a plea agreement which provided that she would plead guilty to

21  one felony and have the other felony charge against her dismissed.  (Lodgment No. 22,

22  Supplemental Clerk's Tr. at 27-28; RT 2041.)  Wise testified that Petitioner and Ward were in

23  her bedroom when the safe was opened, but not Potts.  (RT 2056.)  She said she was present

24  when Jennings' property was being picked over after it was spread out on the pool table in

25  Young's garage. (RT 1937-38.)  Wise said she saw Ward take the cash and the credit cards, and

26  that she saw Petitioner and Potts put coins and other property in a bag which they agreed to

27  share.  (RT 1938-40.)  Wise went home and watched as Overcash, Sommerset and Jimmy

28  Clifton took the empty safe from her bedroom, put it in her car and discarded it.  (RT 1945-46.)

Spohn told her to burn a bag of bloody clothes he had left on her back porch. (RT 1946.) Wise said that Petitioner told her that she could keep the rifle which had been taken from Jennings' home and had been left under her bed. (RT 1949.) Petitioner also told her on the night of the property division that he would come back for a handgun that was registered to him which he had hidden in her backyard, and to pick up the other bag of Jennings' property they left at her house. (RT 1952-53.)

Wise identified the Club used to beat Jennings as one she had given to Spohn a few months before the murder. (RT 1954.) Wise testified that she saw Ward use Jennings' credit card to buy gas, and that Ward told her he had used it at a casino. (RT 1956-57.) Wise said that Ward told her that "he did a burglary and a guy got beat up." (RT 2013.) Wise said that she could not recall whether Spohn had told her that Potts and Petitioner were taking property out of Jennings' house the entire time that Ward and Spohn were fighting with Jennings, but admitted that she had told a detective that Spohn had made that statement to her. (RT 1985-86.) Outside the presence of the jury, Spohn was asked if he had told that to Wise, and he said he could not remember. (RT 1980.) Detective Arnold then testified in front of the jury that he took a statement from Wise on March 21, 1998, and that Wise said that Spohn had told her that when Spohn and Ward were struggling with the victim, Petitioner and Potts were cleaning out the victim's house. (RT 2207.)

Thus, Wise provided direct evidence that Petitioner exhibited control over property taken from Jennings' house by taking a share of the property when it was divided, by giving Wise Jennings' rifle, and by telling her he would come back and pick up the bag of property that had been left at Wise's house. Petitioner also admitted to Wise that he had been armed during the trip to Jennings' house and had hidden his gun in Wise's backyard. This was corroborated by Spohn's testimony that when they first arrived at Wise's house, Ward became upset because Petitioner had spent so much time alone in Wise's backyard. (RT 1718-19.) Finally, Wise further corroborated Spohn's Arkansas statement that Petitioner had participated in removing property from Jennings' house while Jennings was being attacked.

William Moore also testified pursuant to a plea agreement. (Lodgment No. 22, Supplemental Clerk's Tr. at 20-22.) Moore said he had been convicted of five prior felonies, and that he anticipated a life sentence under the Three Strikes law based on any conviction related to this case, so he made a deal with the prosecution that he would testify in exchange for being allowed to plead guilty to a single felony and to be sentenced as a second-striker, and said that he understood that the more he helped the prosecution the better it helped him. (RT 1857-62.) Moore said that he picked Ward up at 6:00 a.m. the morning after the murder, and drove to a house where Petitioner and Potts were staying. (RT 1798-99.) Moore then drove Ward to Wise's house to get Ward's car which was parked in Wise's backyard. (RT 1800-01.) Moore testified that Ward told him that Petitioner and Potts had been cleaning out Jennings' house while Ward and Spohn were dealing with Jennings, although the jury was admonished to use the statement only against Ward. (RT 2605-06.) Wise arrived and Ward asked her about a bag of stuff that was underneath a bed in the house, and Ward became angry when Wise said she did not know what had happened to the bag. (RT 1804-05.) Moore said that Petitioner had arrived just before Wise and was present when Ward asked Wise about the bag. (RT 1805.) Moore also said he heard Petitioner ask Wise where the bag was that had been underneath the bed. (RT 1806.) When Wise said she did not know, Petitioner said that he had "got most of his stuff earlier that day, anyway, so it didn't really matter to him." (RT 1806.) Moore said that Petitioner was a little upset about the missing bag, but not as much as Ward. (Id.)

Moore said he, Ward and Petitioner all left Wise's house, each driving their own vehicles, and they proceeded together to a gas station nearby where Ward used Jennings' credit card to fill up his own vehicle, and then handed the pump to Moore and Petitioner who filled up their vehicles. (RT 1815-17.) Ward had four or five of Jennings' credit cards and used them several days later to go shopping with Moore, during which Moore signed the credit receipts with Jennings' name. (RT 1818-19.) Moore and Ward later used one of Jennings' credit cards to pay for a meal at a casino and unsuccessfully attempted to get a cash advance. (RT 1822-23.)

Thus, Moore's testimony further corroborated Wise's testimony that Petitioner exhibited control over the proceeds of the burglary, that he had taken what he believed to be his share, and

1  that he had participated in using Jennings' credit card to purchase gas for his car.  Clearly

2  established federal law requires a federal habeas court to respect the province of the jury to

3  determine the credibility of witnesses, resolve evidentiary conflicts, draw reasonable inferences

4  from proven facts by assuming the jury resolved all conflicts in a manner that supports the

5  verdict, and consider the evidence "in the light most favorable to the prosecution." Jackson, 443

6  U.S. at 319.  The evidence, when viewed under these deferential standards, is sufficient to show

7  that Petitioner went with Potts, Spohn and Ward to Jennings' house with the intent to rob

8  Jennings or burglarize his house, that he was an active participant by burglarizing the house

9  and/or cutting the telephone line while Ward and/or Spohn beat Jennings to death, and that he

10  shared the criminal purpose of murder in the course of a burglary.  Although it was certainly

11  reasonable for the jury to reject the testimony of Spohn and Ward that they were there for a drug

12  deal, even assuming the jury believed that Petitioner initially went to Jennings' house with no

13  other intent than to be present when money for drugs was collected, the evidence was sufficient

14  to establish that Petitioner thereafter actively participated in burglarizing Jennings' house while

15  he was being murdered.  Reviewing the state court's adjudication of this claim under AEDPA's

16  additional deferential standard, Juan H., 408 F.3d at 1275, the Court concludes that it was

17  objectively reasonable for the appellate court to find that sufficient evidence existed to allow a

18  reasonable jury to find Petitioner guilty of murder and burglary.   The appellate court's

19  determination was, therefore, neither contrary to, nor involved an unreasonable application of,

20  clearly established federal law as set forth in Jackson.  Early, 537 U.S. at 8.  Neither did it

21  involve an unreasonable determination of the facts in light of the evidence presented at trial.

22  Miller-El, 537 U.S. at 340.

23       Habeas relief is **DENIED** as to ground thirteen.

24  **C.   Petitioner is not entitled to habeas relief on ground one.**

25       In ground one, Petitioner claims that his rights to due process and a fundamentally fair

26  trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, under

27  California Constitution Article I, sections 15 and 24, and under California Penal Code section

28  1111, were violated by the manner in which the state courts adjudicated his claim that the jury

was improperly permitted to consider Spohn's uncorroborated accomplice testimony as substantive evidence of guilt. (Pet. at 12-15.) Specifically, he contends the trial court instructed the jury, correctly, that Spohn was an accomplice as a matter of law and that California Penal Code section 1111 proscribes conviction upon the uncorroborated testimony of an accomplice. (Id. at 13.) Petitioner contends, however, that when he raised a claim on direct appeal arguing that his conviction violated Cal. Penal Code section 1111 because Spohn's testimony was not corroborated, or was at best corroborated by other accomplices whose testimony was not corroborated, the appellate court failed to discuss that claim, thereby depriving him of a state-created liberty interest, protected by the Due Process Clause of the Fourteenth Amendment, arising from the state appellate procedures. (Id. at 13.) Petitioner also argues that the error in admitting the statement was not harmless. (Id. at 14-15.)

Respondent contends that the state appellate court explicitly entertained and denied Petitioner's claim alleging a violation of Cal. Penal Code section 1111. (Ans. Mem. at 14.) Respondent also contends that to the extent Petitioner is presenting a claim based on a violation of state law, it is not cognizable on federal habeas. (Id. at 15-16.) Respondent further contends that to the extent ground one presents a federal claim, the adjudication of Petitioner's claim that Spohn's statement was not corroborated was neither contrary to, nor involved an unreasonable application of, clearly established federal law, because federal courts have rejected a rule that uncorroborated accomplice testimony is insufficient to uphold a criminal conviction. (Id.)

Petitioner presented a claim alleging a violation of Cal. Penal Code section 1111 in his petition for review filed in the state supreme court on direct appeal. (Lodgment No. 7 at 15-16.) He argued in the petition for review that the appellate court had failed to address the issue regarding whether Spohn's statement was corroborated with respect to those aspects of the statement which implicated Petitioner. (Id.) Petitioner did not, however, argue in the petition for review that the appellate court's failure to properly address the claim rose to the level of a federal due process violation. (Id.) The petition for review was denied by an order which stated in full: "Petition for review DENIED. Baxter, J., was recused and did not participate." (Lodgment No. 8.)

-34-

Petitioner presented a related claim to the appellate court on direct appeal, where he alleged a violation of Cal. Penal Code section 1111 because Spohn's testimony was not corroborated. (Lodgment No. 1.) As discussed more thoroughly below, the appellate court denied the claim as moot, finding that William Moore and Kristi Wise were not accomplices but were merely accessories, and their testimony was therefore available to corroborate Spohn's testimony. (Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 13-14.) Petitioner contended in a petition for rehearing in the appellate court, as he did in the petition for review in the state supreme court, that the appellate court had failed to consider, among other things, whether any of Spohn's statements were corroborated, and in particular whether there was corroboration of his statements which incriminated Petitioner. (Lodgment No. 5 at 8.) Petitioner did not, however, present the federal aspect of claim one in the petition for rehearing or in the petition for review. (Id.) The petition for rehearing was summarily denied without a statement of reasoning, as was the petition for review. (Lodgment Nos. 6, 8.) Thus, the federal aspect of the claim presented in ground one here, that a Fourteenth Amendment violation occurred because Petitioner was deprived of a state-created liberty interest in state appellate procedures when the state appellate and supreme courts failed to consider his claim that a violation of Cal. Penal Code section 1111 occurred because Spohn's statement was uncorroborated, and in particular uncorroborated to the extent it incriminated Petitioner, was not presented on direct appeal. Neither did Petitioner present the harmless error aspect of ground one when presenting his Cal. Penal Code section 1111 claim to the state supreme court in the petition for review. (Lodgment No. 7 at 15-16.)

Rather, Petitioner presented ground one as a federal claim to the state supreme court for the first and only time in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 12-15.) That petition was denied in a order which stated: Petition for writ of habeas corpus is DENIED. Baxter, J., was recused and did not participate." (Lodgment No. 18.) The Court will look through that silent denial to the last reasoned state court decision with respect to ground one, to the extent there is one. Ylst, 501 U.S. at 804. Petitioner presented ground one to the appellate court in a habeas petition prior to presenting it to the state supreme court. (Lodgment No. 13,

-35-

mem. attached to pet. at 12-15.) That petition was denied as duplicative of a prior habeas petition which had been denied by an order which simply stated that: "The petition for writ of habeas corpus filed in this action on March 11, 2004, is denied. (*Harris v. Reed* (1989) 489 U.S. 255, 263.)" (Lodgment No. 12.) Petitioner also presented ground one to the trial court in a habeas petition prior to filing his appellate court habeas petition. (Lodgment No. 9, mem. attached to pet. at 3-6.) That petition was denied on the basis of an unjustifiable delay in presenting the claims, with citations to <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998) and <u>In re Clark</u>, 5 Cal. 4th 750, 765 n.5 (1993). (Lodgment No. 10, <u>In re Blunt</u>, No. 03-119656, order at 1-2 (Cal.Sup.Ct. Dec. 8, 2003).) The trial court imposed an additional procedural bar as to those claims which were not raised on direct appeal but should have been, as well as with respect to those issues which were already raised on direct appeal and therefore could not be renewed in a habeas petition, citing <u>In re Harris</u>, 5 Cal.4th 813, 829 (1993). The trial court did not specifically identify which claims were subject to which procedural bars. (<u>Id.</u>)

The page of the <u>Harris v. Reed</u> opinion referenced by the appellate court announces a rule that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." <u>Reed</u>, 489 U.S. at 263. It would appear that the state appellate court cited to the <u>Harris v. Reed</u> opinion in order to signal that it was clearly and expressly relying on one or more of the procedural bars imposed by the trial court. However, there were two claims presented to the appellate court on habeas which were not presented to the trial court on habeas, grounds six and seven presented here. As to those grounds, the appellate court's citation to <u>Harris v. Reed</u> might be an indication that the appellate court was applying the same procedural bars imposed by the trial court, or, as Respondent contends, that it is an unexplained order with respect to grounds six and seven.

Respondent's position appears to be that the Court can look through the silent denial of the state supreme court habeas petition to the appellate court's order citing to <u>Harris v. Reed</u>, and to interpret that order as an indication that the appellate court was clearly and expressly relying on the procedural bars imposed by the trial court as to those claims presented for the first

time to the trial court (grounds one, three, four and five), was leaving undisturbed the appellate court adjudication of the claims that had been previously been presented to the appellate court on direct appeal (grounds two and sixteen), and was "unexplained" as to the claims that were presented in the appellate court habeas petition for the first time (grounds six and seven). (See Ans. Mem. at 17-22, 26-27, 34-35, 28-39, 41.) However, Respondent does not contend that ground one is procedurally defaulted, thereby waiving the affirmative defense of procedural default as to ground one. Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).

With respect to ground one, which was not presented on direct appeal but was presented at every level of state habeas review, whether the appellate court's citation to Harris v. Reed is an indication that the appellate court was reaffirming some or any of the procedural bars imposed by the trial court, or reaching the federal grounds presented, is relevant only to which standard of review applies. To the extent the Court can look through the silent denial by the state supreme court to the appellate court order and interpret that order as adopting the procedural bars imposed by the trial court, see Ylst, 501 U.S. at 804, a de novo standard of review applies because the claims were never adjudicated on the merits by any state court. Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002). To the extent the appellate court's citation to Harris v. Reed is unexplained and the Court must consider the silent denial by the state supreme court to be an adjudication of ground one on the merits, see Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992) (holding that a "bare postcard denial" by the California Supreme Court is a decision on the merits which does not support a procedural default if there is no lower court decision which clearly and expressly applies a procedural bar), the Court is required to conduct an independent review of the record to determine whether the state supreme court clearly erred in its application of controlling federal law when it denied ground one without a statement of reasoning. See Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) ("(W)hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly

06cv0463

established federal law.") There is no need to decide which standard of review applies with respect to ground one, because even under a de novo review the claim fails.

Claims alleging violations of state laws do not generally give rise to claims cognizable on federal habeas. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief does not lie for errors of state law). Thus, habeas relief is unavailable to the extent Petitioner presents state law claims in ground one. Nevertheless, the Ninth Circuit has indicated that state laws can give rise to liberty interests cognizable on federal habeas, and that a federal due process violation can arise from arbitrary rulings by state courts. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state, [and] Ninth Circuit precedent generally supports this proposition."), citing Ballard v. Estelle, 937 F.2d 453 (9th Cir. 1991); Tamalini v. Stewart, 249 F.3d 895, 902 (9th Cir. 2001) (noting that if "the State elects to furnish an avenue for appeal, its procedures must comport with the Due Process and Equal Protection Clauses of the Fourteenth Amendment."); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (suggesting that in rare circumstances a determination of state law can be "so arbitrary or capricious as to constitute an independent due process" violation), citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974) (recognizing that absent a specific federal constitutional violation, federal habeas review of state trial errors is limited to whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process.").

Here, the ruling by the state courts with respect to Petitioner's claim that Cal. Penal Code section 1111 was violated was not arbitrary. Petitioner acknowledged in his opening brief on direct appeal that evidence other than Spohn's testimony and his Arkansas statement was presented at trial which incriminated him as an accomplice to the robbery of the victim. This included testimony from Moore that Petitioner allowed Ward to buy him gasoline with the victim's credit card after the murder, which was substantiated by videotapes from the gas station, Moore's testimony that he was present when Petitioner told Wise he no longer cared where the bag containing the victim's property was because he had already taken his share, and Wise's

testimony that Petitioner participated in opening the victim's safe and removing its contents, and was looking for the rifle taken from Jennings' home. (Lodgment No. 1 at 9-19, 47.) As discussed above with respect to the sufficiency of the evidence claim, Wise said that Petitioner told her he hid his handgun in her backyard on the night of the murder, a detective testified that Wise said that Spohn told her that Petitioner and Potts were removing property from Jennings' house while Jennings was being attacked, and Moore testified that Ward told him the same thing. Petitioner argued that the statements by Wise and Moore could not be used to corroborate Spohn's testimony or his Arkansas statement because Moore and Wise were themselves accomplices, and, even if they were not accomplices, their statements only concerned matters which occurred after the murder. (Id. at 43-55.)

The appellate court acknowledged that Petitioner was contending "that because Wise and Moore were accomplices, there was no valid corroboration of Spohn's out-of-court statement." (Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 13.) The appellate court found that Wise and Moore were not accomplices as a matter of law, but were merely accessories, and denied Petitioner's claim as moot on the basis that neither Wise nor Moore were accomplices. (Id. at 14.) Petitioner argued in his petition for rehearing that the appellate court had ignored the aspect of his claim alleging there was no corroboration of those specific aspects of Spohn's in-custody Arkansas statement which implicated Petitioner. (Lodgment No. 5 at 8.) Petitioner now contends that the failure of the appellate court to address this claim in its opinion or in the order denying his petition for rehearing, and the state supreme court's silent denial of the petition for review, amounted to an arbitrary denial of his right to invoke state appellate procedures, thereby depriving him of his federally-protected, state-created liberty interest in those procedures without due process of law. (Pet. at 12-15.) He also argues that the failure of the appellate court to identify the facts upon which it relied to find that Spohn's statements were corroborated amounts to an unreasonable determination of the facts. (Traverse at 5-6.)

The state courts did not arbitrarily deprive Petitioner of his liberty interest in the state's appellate procedures, and did not rest their decision on an unreasonable determination of the

06cv0463

facts. Rather, as discussed above in connection to Petitioner's sufficiency of the evidence claim, Spohn's Arkansas statement implicating Petitioner was corroborated in many respects. The evidence that the events which took place at Jennings' house was a murder in the course of a burglary in which Petitioner was an active participant, as Spohn stated in his Arkansas statement, and not in self defense in the course of a drug deal gone bad during which Petitioner was a scared onlooker, as Spohn testified to at trial, included: 1) Petitioner overhearing Potts say they would need Spohn along because Jennings would know Potts; 2) evidence that Potts had evinced an interest for a long time about Jennings' safe and burglar alarm; and 3) the fact that the telephone line was cut and the house ransacked. Although Petitioner is correct that the jury was admonished that Potts' statements evincing an interest in Jennings' safe was not to be used against Petitioner (RT 929), other evidence implicating Petitioner included the fact that Jennings suffered eleven blows to the head with the Club, eighteen additional wounds to his body, and had his wrists and ankles taped. That evidence is more consistent with murder than a struggle in self-defense, a conclusion further supported by the lack of evidence that Jennings had anything to do with methamphetamine. The inconsistencies between Ward and Spohn's trial testimony, and their obvious efforts to minimize their culpability, weakens Petitioner's argument that the jury should have accepted their self-serving versions and found him to be a passive bystander. Rather, the physical evidence and trial testimony supported and corroborated Spohn's Arkansas statement, which was more believable than his trial testimony, that it was obvious the four men were there for a heist, that Jennings begged for his life and did not know why the men were there, and that Petitioner actively participated in a burglary during the course of a murder.

In addition, the statements by Moore and Wise corroborated other aspects of Spohn's Arkansas statement. As the appellate court noted, Moore testified that the morning after the murder he met Petitioner and Potts at Wise's house and overheard Petitioner and Ward ask Wise about a bag of the victim's property they left there the night before. (Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 7.) Moore testified that when Wise said she did not know where the bag was, Ward was angry but Petitioner said he did not care because he had

already taken his share of the victim's property. (Id.) Wise's statements similarly supported a finding that Petitioner maintained control over the property taken from Jennings' house, raising an inference that he felt he was entitled to a share of the stolen property. More significantly, Wise's statement that Petitioner had admitted to being armed during the murder and burglary, and her statement to the detective that Spohn told her that Petitioner and Potts removed property from Jennings' house while Ward and Spohn were killing Jennings, and Moore's testimony that Ward made an identical statement, directly corroborates these incriminating aspects of Spohn's Arkansas statement.

Petitioner was provided with the opportunity to present his argument that the appellate court had ignored this aspect of his claim in a petition for rehearing filed in the appellate court, as well as in a petition for review in the state supreme court, both of which were denied after the appellate court had determined that adequate corroboration existed as to Spohn's statements. Even assuming reasonable minds could differ with the appellate court on whether Spohn's statements implicating Petitioner were corroborated, it cannot be said that the denial of Petitioner's Cal. Penal Code section 1111 claim by the state courts was arbitrary. A de novo review of this claim reveals that Petitioner is not entitled to habeas relief. See Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (noting that pre-AEDPA habeas review provides that "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution."); Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc) (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant to resolution of the constitutional issue, that reasoning must be part of federal habeas court's consideration even under a de novo review).

The Ninth Circuit has also held that a federal habeas petitioner may establish a due process violation by showing that an evidentiary ruling was so prejudicial that it rendered his trial fundamentally unfair. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). To the extent ground one encompasses a

claim alleging a federal due process violation arising from the admission of Spohn's Arkansas statement because it was uncorroborated (see Pet. Mem. at 14-15), it is without merit. Petitioner has failed to demonstrate that Spohn's Arkansas statement was not corroborated by the other evidence presented at trial. Rather, Spohn's Arkansas statement was not only corroborated, it was more likely to be true than his self-serving trial testimony which conflicted with much of the other evidence presented at trial. Thus, Petitioner did not receive a fundamentally unfair trial as a result of its admission. Even to the extent its admission was error, any error was harmless. As discussed above with respect to the sufficiency of the evidence claim, there was sufficient evidence to support Petitioner's conviction apart from Spohn's Arkansas statements. In addition, Spohn's Arkansas statement implicated Petitioner and Potts equally, yet the jury asked for leniency as to Petitioner but not Potts, suggesting they did not entirely accept the Arkansas statement. Thus, even assuming the trial court erred in permitting evidence of Spohn's in-custody Arkansas statement, any such error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Based on a de novo review of the record, habeas relief is **DENIED** as to ground one.

**D.      Petitioner is not entitled to habeas relief on ground two.**

Petitioner contends in ground two that he received ineffective assistance of counsel because his trial counsel failed to object to the admission of Spohn's in-custody Arkansas statement, and failed to introduce evidence supporting such an objection. (Pet. at 16.) He argues that Spohn's statement was an involuntary confession and/or was taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and that his trial counsel's failure to object to its admission was incompetent and prejudicial because the statement was the whole case against Petitioner. (Pet. at 16-27.) He also contends that portions of Spohn's statement tended to exonerate Petitioner, but the trial court erroneously instructed the jury to view Spohn's entire statement with distrust, rather than viewing only the portions which helped the prosecution with distrust, and that the appellate court opinion finding that any instructional error did not rise to the level of a constitutional violation or that Petitioner was not prejudiced, unreasonably applied

-42-

clearly established federal law. (Pet. at 26-32.) This second aspect of ground two is duplicative

of ground nine, and the Court will address it in connection to that claim.

Respondent argues that the ineffective assistance aspect of ground two relies on two

unsupportable assumptions, that Spohn's statement was inadmissible and that any effort by trial

counsel to exclude the statement would have been successful. (Id. at 19.) Respondent contends

that because the appellate court correctly determined there was no basis for challenging the

voluntariness of the statement, the adjudication of this claim by the state appellate court was

neither contrary to, nor involved an unreasonable application of, clearly established federal law,

and was not based on an unreasonable determination of the facts. (Ans. Mem. at 17-20.)

/ / /

Petitioner presented this claim to the state supreme court in a habeas petition. (Lodgment

No. 17, mem. attached to pet. at 16-32.) That petition was summarily denied without a

statement of reasoning or citation of authority. (Lodgment No. 18.) The claim was also

presented to the state appellate court both in a habeas petition and on direct appeal. (Lodgment

No. 1 at 65-72; Lodgment No. 13 at 16-32.) The Court will look though the silent denial by the

state supreme court to the last reasoned decision of the state courts with respect to this claim,

which is the appellate court opinion denying the claim on direct appeal.[1]

The appellate court stated in denying this claim on direct appeal, that:

> Here, there is nothing in the appellate record which would indicate why
> counsel did not object to the admission of Spohn's statement on the basis that is
> was involuntarily made. However, even if such a challenge had been made, it
> would have been fruitless as there was no basis for challenging the voluntariness
> of the statement.

---

[1] If the Court is permitted to look through the state appellate court's citation to Harris v. Reed
to the trial court's imposition of a state procedural bar regarding the inability of further review on habeas
of claims raised on direct appeal, the Court must look to the appellate court opinion denying the claim
on direct appeal. See Ylst, 501 U.S. at 804 n.3 (observing with respect to California's rule precluding
further habeas review of claims which were raised and adjudicated on direct appeal: "Since a later state
decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a
pre-existing procedural default, its effect upon the availability of federal habeas is nil – which is precisely
the effect accorded by the 'look-through' presumption.") If the Court is not permitted to look through
the Harris v. Reed citation, because it is unexplained, then the Court would also look to the appellate
court opinion on direct appeal because it would be the last reasoned decision of the state courts as to
this claim.

The record shows the following. Spohn testified that when he was pulled over in Arkansas, police officers pulled him out of the truck, threw him into the gutter, "smacked the shit out of me, and pretty much abused me" before he was arrested. Spohn testified he was then stripped, taken to a rubber room cell, and went without clothing, bed or food until the following morning. He was then placed into a cell. Spohn later described the incident as having been "slap[ped] and push[ed] around" and having "missed a couple of meals." However, it was not the Arkansas officers to whom Spohn gave the statement in question. Instead, he was interviewed by Tulare County Detectives Arnold and Lomeli in Arkansas. Nothing in the record indicates Spohn's statement to Detectives Arnold and Lomeli was in any way coerced.

Blunt was not rendered ineffective assistance of counsel by counsel's failing to bring a motion to exclude Spohn's Arkansas statement on the basis that it was involuntarily coerced. We therefore need not address Potts's joinder in the issue.

(Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 44.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable." Id. To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.") The prejudice inquiry is to be considered in light of the strength of the prosecution's case. Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

06cv0463

Petitioner has failed to establish that his trial counsel was deficient in failing to move to suppress Spohn's in-custody Arkansas statement, or that he was prejudiced by the failure. Everyone who was present during Spohn's statement testified at trial, including Spohn and the two Turlare County Detectives who took the statement. Although Petitioner argues at length why he believes Spohn's statement was involuntary and/or taken in violation of <u>Miranda</u> (<u>see</u> Pet. at 17-21), he fails to demonstrate that the state court's determination that the statement was taken under conditions that did not violate <u>Miranda</u> or demonstrate involuntariness was objectively unreasonable. Petitioner's contention that Spohn's request for counsel was denied by the Arkansas officers is incorrect. Spohn specifically told the officers that he wished to make a statement without the presence or assistance of a lawyer. (Lodgment No. 9, Ex. D.) Spohn waived his <u>Miranda</u> rights prior to giving his statement. (<u>Id.</u>) Moreover, the statement was taken by Tulare County detectives well after Petitioner was arrested, and not by the Arkansas officers who allegedly mistreated Spohn upon his arrest. (<u>Id.</u>; RT 1485.) Spohn admitted that he had merely been slapped and pushed around upon his arrest, and not seriously mistreated. (RT 1715.) Spohn also stated that although he felt pressured, he was not scared when making the statement. (RT 1566, 1612.) Even to the extent there are certain aspects of Spohn's version which could have been used to argue a motion to suppress the statement, the prosecutor challenged Spohn's unsubstantiated version of what happened to him in Arkansas, suggesting that Spohn was embellishing in order to lessen the "snitch" reputation he was going to have in prison, and to invent an excuse for testifying against his friends. (RT 1711-15.) In any case, Spohn's account that the detectives lied to him that the others had "turned on him" and "pointed the finger" at him (RT 1705), even if true, does not support a finding that the statement was involuntary. <u>See</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (finding that a misrepresentation to a suspect that his co-suspects had already confessed did not render confession coerced).

The record does not support a finding that a motion to suppress Spohn's Arkansas statement would have been successful, and the appellate court's finding to that extent is objectively reasonable. Petitioner has therefore failed to demonstrate that his trial counsel was deficient for failing to bring such a motion, or that he was prejudiced by such a failure. The

state appellate court's opinion finding that Petitioner did not receive ineffective assistance of counsel because there is no basis in the record to support a contention that trial counsel could have successfully moved to suppress Spohn's statement, was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. <u>Strickland</u>, 466 U.S. at 687; <u>Williams</u>, 529 U.S. at 405-07; <u>Miller-El</u>, 537 U.S. at 340.

Habeas relief is **DENIED** as to ground two.

**E.     Petitioner is not entitled to habeas relief as to ground three.**

Petitioner contends in ground three that the prosecutor's use of false evidence undermined confidence in the verdict and denied him due process in violation of the Fourteenth Amendment, California Penal Code section 1473(B)(1), and the California Constitution, Article I, sections 15 and 24. (Pet. at 32.) Specifically, he argues that the prosecutor knowingly allowed Spohn to testify falsely for the nefarious purpose of introducing his in-custody Arkansas statement as impeachment evidence. (<u>Id.</u> at 34-38.)

Respondent contends ground three is procedurally defaulted because the state courts imposed two separate procedural bars: 1) untimeliness; and 2) the failure to raise the claim on direct review. (Ans. Mem. at 20-22.) Respondent contends that both bars are independent of federal law and adequate to support the judgment, and that Petitioner has failed to demonstrate cause and prejudice to the excuse the default, or that a fundamental miscarriage of justice would result if the Court does not reach the merits of ground three. (<u>Id.</u> at 22-24.) Respondent also contends that even if ground three is not procedurally defaulted, it is without merit. (<u>Id.</u> at 24-25.)

Petitioner replies that the Court should treat the silent denial by the state supreme court as a decision on the merits, and that ground three is therefore not procedurally defaulted. (Traverse at 23.) Petitioner also argues that any default should be excused due to the ineffective assistance of his appellate counsel in failing to raise ground three on direct appeal. (Pet. at 107.)

Petitioner presented ground three to the state supreme court in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 32-38.) That petition was summarily denied without

a statement of reasoning or citation of authority.  (Lodgment No. 18.)  He presented the same claim to the appellate court in a habeas petition prior to presenting it to the state supreme court.  (Lodgment No. 13, mem. attached to pet. at 32-38.)  That petition was denied as duplicative of a prior habeas petition, which in turn was denied by an order which stated: "The petition for writ of habeas corpus filed in this action on March 11, 2004, is denied.  (*Harris v. Reed* (1989) 489 U.S. 255, 263.)"  (Lodgment No. 12.)  Petitioner presented ground three in the same manner as it is presented here in a habeas petition in the trial court.  (Lodgment No. 9, mem. attached to pet. at 19-25.)  The trial court denied the habeas petition on the basis of an unjustifiable delay in presenting the claims, with citations to In re Robbins, 18 Cal.4th at 780 and In re Clark, 5 Cal. 4th at 765 n.5.  (Lodgment No. 10, In re Blunt, No. 03-119656, order at 1-2 (Cal.Sup.Ct. Dec. 8, 2003).)  The trial court imposed an additional procedural bar as to those claims which were not raised on direct appeal but should have been,  as well as with respect to those issues which were already raised on direct appeal and therefore could not be renewed in a habeas petition, citing In re Harris, 5 Cal.4th at 829, but without identifying which claims were subject to which procedural bars.  (Id.)

The citations to Robbins and Clark indicate that the trial court denied the habeas petition on the basis of Petitioner's failure to timely present the claims therein.  See In re Robbins, 18 Cal.4th at 780 ("setting forth analytical framework governing our timeliness determination"), see also In re Clark, 5 Cal.4th at 765 n.5 (setting forth standards to determine whether a habeas petition was filed without substantial delay).  In addition, a separate procedural bar arose from Petitioner's failure to present the claim on direct appeal.  See Coleman v. Thompson, 501 U.S. 722, 735 n.* (1991) (holding that a procedural default arises when a petitioner has "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.").  The citation to the California Supreme Court's Harris opinion reflects imposition of a state procedural bar regarding the failure to present ground three on direct appeal.  See In re Harris, 5 Cal.4th at 829 ("Proper appellate procedure thus demands that, absent strong

-47-

justification, issues that could be raised on appeal must initially be so presented, and not on habeas in the first instance.")

A claim presented in a federal habeas petition which has been rejected by the state courts on the basis of a procedural rule that is independent of federal law and adequate to support the judgment is procedurally defaulted. <u>Coleman</u>, 501 U.S. at 750. Respondent has the initial burden of pleading as an affirmative defense that Petitioner's failure to satisfy a state procedural rule forecloses federal habeas review. <u>Bennett</u>, 322 F.3d at 586. The burden then shifts to Petitioner to challenge the independence or adequacy of the procedural bar. <u>Id.</u> If Petitioner makes a sufficient showing, then the ultimate burden of proving the independence and adequacy of the procedural rule falls on Respondent. <u>Id.</u>

To the extent the Court can look through the appellate court order citing <u>Harris v. Reed</u> to the trial court order imposing the procedural bars of untimeliness and failure to raise the claim on direct appeal, Respondent bears the burden of demonstrating that both procedural bars are adequate and independent. <u>Washington v. Cambra</u>, 208 F.3d 832, 834 (9th Cir. 2000) (holding that when two state procedural rules are invoked in a single order disposing of multiple claims, the ambiguity does not preclude procedural default so long as both bars are adequate and independent). A state procedural rule is "independent" if it is not interwoven with federal law. <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001). A state rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default. <u>Calderon v. United States District Court</u>, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent admits that the Ninth Circuit has previously found California's rule of timeliness, and the rule barring habeas petitions which present claims which should have been presented on direct appeal, were not "adequate" to support a federal procedural default. (Ans. Mem. at 22.) The Ninth Circuit has held these rules to be inconsistently applied or not sufficiently well-established prior to the date of the California Supreme Court's <u>Clark</u> decision. <u>Morales v. Calderon</u>, 85 F.3d 1387, 1391 (9th Cir. 1996); <u>Park v. California</u>, 202 F.3d 1146, 1151 (9th Cir. 2000). Where Respondent has carried the initial burden under <u>Bennett</u> with respect to a procedural bar that has previously been found to be inadequate, as here, and the

burden has shifted to Petitioner, as here, Petitioner satisfies his burden simply by contesting the adequacy of the state rule. <u>King v. Lamarque</u>, 464 F.3d 963, 967-68 (9th Cir. 2006). The burden then shifts back to Respondent to prove the adequacy of the procedural rule. <u>Id.</u> at 968.

Petitioner here challenges the adequacy of the state procedural bars applied to ground three. (Pet. Mem. at 112; Traverse at 23.) Respondent makes no effort to prove that these procedural bars have been applied consistently since the <u>Clark</u> opinion, and has therefore failed to carry the ultimate burden of demonstrating that ground three is procedurally defaulted. <u>King</u>, 464 F.3d at 967-68. Thus, the Court is faced with the same issue as ground one regarding what standard of review is applicable to ground three. To the extent the appellate court's order citing <u>Harris v. Reed</u> is unexplained, the Court must conduct an independent review of the record in order to determine whether the silent denial by the state supreme court was contrary to, or involved an unreasonable application of, clearly established federal law. <u>Greene</u>, 288 F.3d at 1089; <u>Hunter</u>, 982 F.2d at 347-48. To the extent the appellate court order citing <u>Harris v. Reed</u> is an indication that ground three was denied on the basis of one or more state procedural rules, then the claim was not adjudicated on the merits and the Court must conduct a de novo review. <u>Pirtle</u>, 313 F.3d at 1167-68. The Court need not decide which standard of review applies, because even under a de novo review habeas relief is unavailable.

"To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)). The misconduct must "so infect the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). It does not constitute prosecutorial misconduct to introduce a prior inconsistent statement of a "turncoat witness" who discards an apparently truthful pretrial statement and testifies differently at trial, provided it is made clear to the court and the defense that such an event is occurring and why. <u>Commonwealth of Northern Mariana Islands v. Bowie</u>, 243 F.3d 1109, 1118 n.4 (9th Cir. 2001), citing <u>California v. Green</u>, 399 U.S. 149 (1970).

Petitioner had failed to demonstrate prosecutorial misconduct arising from the decision to call Spohn as a trial witness and to impeach him with his prior statements. As discussed in connection to the sufficiency of the evidence claim, it is unclear which version of the events given by Spohn, the version give at trial or in his Arkansas statement, was true, but that the evidence adduced at trial permitted Petitioner to be found guilty under either version. Spohn testified consistently with the statement he gave to the police on September 10, 1999, which was recorded and available to the defense. (RT 1671-74.) Thus, the defense was aware that Spohn's statement in anticipation of his testimony conflicted with his prior Arkansas statement in many respects. In fact, Spohn said in his September 10, 1999 statement and his trial testimony that Petitioner was standing by the car doing nothing while the crime was occurring. (RT 1674-76.) In such a case, presenting both versions to the jury does not amount to prosecutorial misconduct. Bowie, 243 F.3d at 1118 n.4. In any case, Spohn testified to a nearly identical version of the events as did Ward, with the exception of which of them administered the blows to Jennings with the Club. The determination as to who hit Jennings with the Club did not affect Petitioner's culpability. Thus, by calling Spohn to testify at trial, the prosecutor did not "infect the trial with unfairness." Donnelly, 416 U.S. at 643,

A de novo review of the record with respect to ground three reveals that it is without merit. Habeas relief is **DENIED** as to ground three.

**F.    Petitioner is not entitled to habeas relief as to ground four.**

Petitioner contends in ground four that he was prohibited from consulting with his counsel during trial, and argues that to the extent the claim is procedurally defaulted, any default should be excused due to the failure of his appellate counsel to raise the claim on direct appeal. (Pet. at 38.) He alleges that the courtroom deputies required him to sit four or five feet behind his trial counsel during the courtroom proceedings, which impaired his ability to communicate with counsel during trial. (Id. at 38-42.)

Respondent contends that ground four is procedurally defaulted by virtue of the imposition of separate procedural bars by the state courts of untimeliness and failure to present

the claim on direct appeal. (Ans. Mem. at 25-27.) Respondent also contends that habeas relief as to this claim is barred by Teague v. Lane, and that the claim is without merit. (Id. at 27-33.)

Ground four was presented to the state courts in the same procedural manner as ground three. (See Lodgment No. 9, mem. attached to pet. at 25-29; Lodgment No. 13, mem. attached to pet. at 38-42; Lodgment No. 17, mem. attached to pet. at 38-42.) The Court rejects Respondent's procedural default argument, and will conduct a de novo review of ground four, for the same reasons set forth with above respect to ground three.

Respondent argues that habeas relief is barred by Teague because "Petitioner has presented no case that has held that a defendant has a federal Constitutional right to be seated beside his attorney," and argues that Petitioner "has in no way demonstrated that the court's order denying him relief" fell within a Teague exception. (Ans. Mem. at 28.) Other than grossly oversimplifying this claim, which alleges a violation of Petitioner's right to communicate with counsel during trial and not a violation of his right to be allowed to sit next to him, Respondent has failed to adequately argue Teague. See Arredondo v. Ortiz, 365 F.3d 778, 781-82 (9th Cir. 2004) ("If the state seriously wishes to press Teague, . . . the new rule of constitutional law that falls within its proscription should be articulated, the reasons why such a rule would not have been compelled by existing precedent should be explained with particular reference to the appropriate universe of precedent, and an argument should be made why the rule contended for is not within one of Teague's exceptions.") Thus, the Court will not address Respondent's Teague argument.

However, a de novo review of the record with respect to ground four reveals it to be without merit. In United States v. Larson, 460 F.3d 1200 (9th Cir. 2006), a case where four defendants were indicted for conspiracy to distribute controlled substances, two defendants pleaded guilty before trial and testified against the other two at a joint trial. The defendants who were tried together alleged on appeal that their federal constitutional rights to a fair trial, due process, a meaningful defense, and competent counsel were violated because the trial court refused their request to be seated at the counsel table, rather than directly behind their attorneys. Id. at 1213-16. The Ninth Circuit found the arrangement to be a reasonable accommodation for

a crowded courtroom, noted the lack of any indication in the record that the arrangement prejudiced the defendants in any way, such as imposing physical burdens or restraints that might confuse or embarrass the defendants, and found that the record did not support a finding that being seated directly behind their attorneys prevented the defendants from communicating with counsel. Id.

Although Petitioner contends he desired to consult with counsel during trial, he has failed to identify anything in the record to support a finding that he was prevented from doing so in any specific instance. (Traverse at 29-30.) Moreover, even assuming Petitioner was prevented by the deputies from leaning forward and speaking to counsel when the trial was in session, there is no indication that Petitioner was prevented from speaking to counsel during breaks in the courtroom proceedings, or even passing notes to counsel while the court was in session. See Larson, 460 F.3d at 1216, citing United States v. Jones, 766 F.2d 994, 1004 (6th Cir. 1985) (finding no violation of the right to consult with counsel because the defendants could pass notes to counsel and counsel could get up from the counsel table and speak to the defendants). Petitioner has failed to establish that he was prejudiced by the arrangement because he has failed to demonstrate that an opportunity was missed during the trial by his inability to communicate with counsel, and has failed to allege that any such missed opportunity could not have been cured by communicating with counsel during breaks in the trial.

Based on a de novo review of the record with respect to ground four, habeas relief is **DENIED** as to this claim.

**G.      Petitioner is not entitled to habeas relief as to ground five.**

Petitioner contends in ground five that his trial counsel rendered ineffective assistance by failing to object to misconduct by the prosecutor. (Pet. at 42.) He argues that his trial counsel should have objected when the prosecutor called Spohn to testify, and should have requested the court to admonish the prosecutor during closing argument when a defense objection for arguing facts not in evidence was sustained. (Id. at 42-45.)

Respondent argues that this claim is procedurally defaulted by virtue of its denial by the state court on the ground that Petitioner unjustifiably delayed presenting the claim. (Ans. Mem. at 34-35.) Respondent also contends the claim is without merit. (Id. at 35-38.)

Ground five was presented to the state courts in the same procedural manner as ground three. (See Lodgment No. 9, mem. attached to pet. at 29-32; Lodgment No. 13, mem. attached to pet. at 42-45; Lodgment No. 17, mem. attached to pet. at 42-45.) The Court rejects Respondent's procedural default argument for the same reasons set forth above with respect to ground three, and will conduct a de novo review of the record with respect to ground five.

As set forth above with respect to ground three, Petitioner has failed to demonstrate prosecutorial misconduct as a result of the prosecution calling Spohn to testify. Thus, there is no basis for a finding of ineffective assistance of counsel for failing to object.

Neither has Petitioner established misconduct in closing argument. Petitioner contends the prosecutor misrepresented the trial testimony when he said he did not put Spohn on the stand in order to solicit anything that was not true. (Pet. Mem. at 42-43.) This argument is based on Petitioner's contention, found to be without merit in ground three above, that the prosecutor committed misconduct by calling Spohn to testify when he knew Spohn would lie on the stand. Petitioner also contends the prosecutor argued to the jury that their key witnesses were criminals and liars and should not be believed. (Id. at 43, citing RT 2672-82, 2798-806.) The prosecutor was merely commenting on the fact that the jury heard different versions of the crime by the various witnesses who were involved, and argued to the jury that the version which the jury should believe, in light of all the evidence, was the version given by Spohn in his Arkansas statement. (RT 2672-82.) The prosecutor also argued that the truth may have been a hybrid of the stories, that even if the men went to Jennings' house in connection to a drug deal, they were determined to take money or property even if they had to kill Jennings to get it. (RT 2800-06.) As discussed above in connection to the sufficiency of the evidence claim, a reasonable inference could be drawn that the version given at trial by Spohn and Ward was an attempt to lessen their culpability, and it was reasonable for the jury to find, consistent with the

1  prosecutor's argument, that the men either initially intended to rob Jennings and burglarize his

2  home, or decided to do so after Jennings refused to pay what he allegedly owed.

3      Petitioner contends that counsel should have requested an admonition when an objection

4  was sustained during the prosecutor's closing argument. Only two objections were made during

5  the prosecutor's closing argument, both contending that the prosecutor was misstating the

6  evidence, and neither resulted in an admonition to the jury. (RT 2677-78, 2795-97.) The

7  prosecutor argued there was no blood found on the carpeting going upstairs, implying that

8  someone other than Jennings had gone upstairs to retrieve the .357 handgun, and Petitioner's

9  counsel objected on the basis that there had been no testimony regarding whether there was or

10 was not blood on the stair carpet. (RT 2677-78.) The trial judge did not explicitly rule on the

11 objection but allowed the prosecutor to argue that there was no evidence of blood on the stair

12 carpet, which she then did. (RT 2678.) Petitioner has identified no need for a jury

13 admonishment as to this first objection. The second objection was made in response to the

14 prosecutor's attempt to list items which corroborated Spohn's Arkansas statement, which drew

15 a speaking objection from Ward's counsel heard by the jury, to the extent that the items listed

16 by the prosecutor did not corroborate Spohn's testimony. (RT 2795-96.) There was no explicit

17 ruling on the objection, but the trial judge instructed the prosecutor to limit her corroboration

18 argument to the statements made by Wise, which she did. (RT 2796-99.) Petitioner has not

19 demonstrated that he was prejudiced by his counsel's failure to ask for an admonition in

20 connection to this objection, particularly since the prosecutor abandoned the argument in

21 response to an objection which was heard by the jury, and because sufficient evidence existed

22 to corroborate Spohn's Arkansas statement.

23      Because Petitioner has failed to establish there was any basis for an objection to the

24 prosecutor's closing argument other than those made, and has failed to establish that he was

25 prejudiced by the failure to object or to request a jury admonition, he has not established

26 ineffective assistance of counsel. Strickland, 466 U.S. at 687.

27      Based on a de novo review of the record with respect to ground five, habeas relief is

28 **DENIED** as to this claim.

**H.     Petitioner is not entitled to habeas relief as to ground six.**

Petitioner contends in ground six that his trial counsel rendered ineffective assistance in connection to his motions for substitution of counsel. (Pet. at 45.) Specifically, he alleges that he twice requested replacement of his trial counsel, once before trial and once after, but the trial judge failed to make an adequate inquiry into his requests, and his trial counsel lied to him when he told him that the court had ruled on his requests. (Id. at 45-47.)

Respondent contends that an independent review of the record reveals that the denial of this claim by the state appellate court was neither contrary to, nor involved an unreasonable application of, clearly established federal law. (Ans. Mem. at 38-40.)

Ground six was presented to the state supreme court in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 45-47.) That petition was summarily denied without a statement of reasoning or citation of authority. (Lodgment No. 18.) Petitioner presented an identical claim to the appellate court in a habeas petition prior to presenting it to the state supreme court. (Lodgment No. 13, mem. attached to pet. at 45-47.) That petition was denied as duplicative of a prior habeas petition, which in turn was denied by an order citing to the Harris v. Reed opinion. (Lodgment No. 12.) The claim was not presented to the trial court in the habeas petition which preceded the appellate and supreme court habeas petitions. (Lodgment No. 9.) Since there was no lower court order or opinion imposing a procedural default, the reference to the Harris v. Reed opinion by the appellate court does not appear to apply to ground six, leaving the appellate court order unexplained, as Respondent contends. Although it is theoretically possible that the appellate court intended to apply in the first instance the procedural bars identified by the trial court to this claim, even though it was not raised in the trial court, there is no clear indication that the state supreme court was relying on the imposition of a procedural bar. The Court will therefore conduct an independent review of the record in order to determine whether the silent denial by the state supreme court was contrary to, or involved an unreasonable application of, clearly established federal law. Lambert, 288 F.3d at 1089; Hunter, 982 F.2d at 347-48.

Petitioner presents a copy of a letter he wrote to the trial judge on June 12, 1998, informing the judge that he was requesting another attorney be appointed. (Lodgment No. 17, Ex. I at 1.) The record reflects that about two months later, on August 7, 1998, about a year before trial, the Tulare County Conflict Public Defender filed a "Petition to Relieve Three Attorneys and Appoint Three New Attorneys." (CT 357-60.) The motion was based on the fact that the County Conflict Public Defender had appointed attorneys for the four defendants after the County Public Defender had declared a conflict, but the District Attorney had since decided to seek the death penalty, and the contract between the County Public Defender and the County Conflict Public Defender limited the County Conflict Public Defender to furnishing only one attorney in any one death penalty case. (CT 358.) Petitioner was present at a hearing held on the motion on August 11, 1998, when the matter was continued to August 12, 1998. (CT 364.) Petitioner was present when new counsel for Ward was appointed on August 12, 1998. (Id.) The matter was continued for one day as to Petitioner and Potts. (Id.) Petitioner was present on August 13, 1998, when the matter was again continued. (Id.) Petitioner was again present on August 18, 1998, when a motion to withdraw the petition to appoint new counsel was granted. (CT 369.) Petitioner provides no details regarding his unsupported allegation that his motion to substitute counsel prior to trial was denied or that his trial counsel lied to him and told him it was denied. Rather, the record reflects that Petitioner was present in court when a motion to substitute counsel was granted as to Ward and was withdrawn as to him and Potts.

It is well established that the Sixth Amendment requires an appropriate inquiry into the grounds for a motion to substitute consel. Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("The trial court must take the time to conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.") However, "The [Sixth] 'Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.'" Schell, 218 F.3d at 1025-26, quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989).

Although the record here does not contain a transcript of the pre-trial motion hearing, Petitioner does not allege why the hearing was insufficient to protect his right to adequate representation. The lack of any specific allegations in support of the claim in this Court precludes granting habeas relief. <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994). To the extent Petitioner contends he was not represented by competent counsel for the reasons set forth in his ineffective assistance claims presented in his federal Petition, his contention is without merit for the reasons discussed throughout this Order. Accordingly, he has failed to demonstrate that the state supreme court clearly erred in its application of controlling federal law. <u>Pirtle</u>, 313 F.3d at 1160; <u>Greene</u>, 288 F.3d at 1089; <u>Schell</u>, 218 F.3d at 1025-26.

Petitioner wrote another letter to the trial judge dated February 24, 2000, after he had been found guilty in October of 1999, requesting the court schedule a <u>Marsden</u>[2] hearing in order to substitute counsel and allow new counsel to prepare a motion for a new trial. (CT 1243.) The motion was heard on April 10, 2000, just before sentence was imposed. (RT 3160.) Petitioner has submitted a transcript of this motion, which was denied. (Lodgment No. 17, Ex. M at 3-22.) The transcript indicates that the trial judge gave Petitioner's motion more than adequate attention, allowed Petitioner to express his reasons at length for seeking substitution of counsel, allowed counsel to speak to the issues, and denied the motion after thoughtful consideration. (<u>Id.</u>) Petitioner has failed to demonstrate that the motion hearing was insufficient to protect his right to adequate representation, and has not presented sufficient facts to demonstrate that he was not adequately represented in any post-trial proceedings.

Based on an independent review of the record, the silent denial of ground six by the state supreme court was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Habeas relief is **DENIED** as to ground six.

I.     **Petitioner is not entitled to habeas relief as to ground seven.**

---

[2]  <u>People v. Marsden</u>, 2 Cal.3d 118 (1970). The Court in <u>Marsden</u> held that a defendant represented by appointed counsel or the public defender may request the court to discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney. <u>Id.</u> at 123.

Petitioner contends in ground seven that his trial counsel rendered ineffective assistance by failing to investigate and prepare for trial. (Pet. at 47.) He alleges that counsel failed to interview a number of witnesses who could have testified that the victim was killed by a third party because the victim was involved in manufacturing methamphetamine, failed to follow up on leads which might have shown that Jennings was taken from his house to the orchard where he was found and killed there by persons who arrived at the scene after Petitioner and the others had left, failed to investigate whether there was any basis to suppress Spohn's Arkansas statement, failed to request a jury instruction regarding corroboration of accomplice testimony, and failed to request an instruction on third party culpability. (Id. at 47-51.)

Respondent argues that Petitioner has failed to demonstrate that the silent denial of this claim by the state supreme court was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. (Ans. Mem. at 41.)

Ground seven was presented to the state courts in the same procedural manner as ground six. (Lodgment No. 17, mem. attached to pet. at 47-51; Lodgment No. 18; Lodgment No. 13, mem. attached to pet. at 47-51; Lodgment Nos. 1, 9, 12.) For the same reasons set forth above with respect to ground six, the Court will conduct an independent review of the record in order to determine whether the silent denial by the state supreme court was contrary to, or involved an unreasonable application of, clearly established federal law. Lambert, 288 F.3d at 1089; Hunter, 982 F.2d at 347-48.

Petitioner first contends that his trial counsel failed to contact Luis Medina, Katherine Berry, Sandra Estrada, Bill Arblaster and a person named Kemp, who might have provided evidence regarding Jennings' methamphetamine activities, and failed to follow up on police leads indicating that Jennings had been killed in his orchard as a result of his methamphetamine activities hours after Petitioner left the house. (Pet. Mem. at 47-50.) As noted above, the evidence established Petitioner's guilt irrespective of whether the men went to Jennings' house in connection to a drug deal and then decided to murder him and burglarize his house, or if they went there originally intending to rob him. The medical evidence at trial showed that Jennings

died of blunt trauma to the head, lived no more than half an hour after being attacked, and that his injuries were consistent with Ward and Spohn's testimony that he was hit in the head with the Club ten or eleven times. Petitioner has identified no basis for his contention that Jennings was killed by someone else hours later in his orchard, or that following up on leads which may have connected Jennings to methamphetamine would have helped his defense.

Petitioner next contends that there is no evidence in his trial counsel's file that counsel was aware of Petitioner's standing to challenge the admission of Spohn's Arkansas statement, or that counsel researched a possible motion to suppress. (Pet. Mem. at 49-50.) As set forth above in connection to ground two, counsel was not deficient in failing to make a motion to suppress Spohn's Arkansas statement and Petitioner was not prejudiced by any such failure. Petitioner contends there is no evidence in his trial counsel's file to show that counsel requested the jury be instructed to view accomplice testimony with distrust only to the extent it incriminates the other accomplices, not to the extent it exonerates them. (Pet. Mem. at 50.) This claim is without merit for the reasons set forth below with respect to grounds nine and ten.

Petitioner contends his trial counsel was deficient in failing to request an instruction on third party culpability. (Id. at 50.) Petitioner appears to contend that there was evidence of third party culpability because Jennings was left on the threshold of his house with his hands taped and, in Spohn's opinion, looking "not that bad," but was found dead in his orchard. Thus, Petitioner contends, someone came along after they left and killed Jennings in the orchard. However, this ignores the testimony of the medical examiner that the eleven blows to Jennings' head with the Club were the cause of his death, and that he probably lived only a few more minutes after he was attacked, and at most a half an hour. Thus, evidence such as William Moore's hat having been found on Jennings' driveway suggesting that someone came to Jennings house after Petitioner left, and in particular someone from Wise's house who allegedly knew that Jennings' house had been burglarized earlier in the evening, would not exonerate Petitioner from the murder of Jennings or the burglary of his house.

An independent review of the record demonstrates that the silent denial of this claim by the state supreme court was neither contrary to, nor involved an unreasonable application of,

1  clearly established law. <u>Strickland</u>, 466 U.S. at 687; <u>Williams</u>, 529 U.S. at 405-07. Habeas

2  relief is **DENIED** as to ground seven.

3  **J.      Petitioner is not entitled to habeas relief as to ground eight.**

4          Petitioner alleges in ground eight that he was denied his rights to confrontation and cross-

5  examination by the introduction of double hearsay. (Pet. at 52.) He alleges that Detective Frank

6  Arnold was impermissibly allowed to testify that Wise told him that Spohn told her that Potts

7  and Petitioner were taking property from the victim's house while Spohn and Ward were

8  assaulting the victim. (<u>Id.</u>) Respondent contends this claim relies primarily on state law, and

9  that Petitioner has not shown that the silent denial of the claim by the state supreme court was

10 contrary to, or involved an unreasonable application of, clearly established federal law. (Ans.

11 Mem. at 48-49.)

12         Ground eight was presented to the state supreme court in a habeas petition. (Lodgment

13 No. 17, mem. attached to pet. at 52-78.) That petition was summarily denied without a

14 statement of reasoning or citation of authority. (Lodgment No. 18.) Ground eight was not

15 presented to any other state court, and the Court will therefore conduct an independent review

16 of the record in order to determine whether the silent denial by the state supreme court was

17 contrary to, or involved an unreasonable application of, clearly established federal law.

18 <u>Lambert</u>, 288 F.3d at 1089; <u>Hunter</u>, 982 F.2d at 347-48. Because the appellate court addressed

19 a similar claim raised by one of Petitioner's co-defendants on direct appeal, the appellate court's

20 reasoning must be part of the Court's consideration of Petitioner's claim. <u>Frantz</u>, 533 F.3d at

21 738.

22         Detective Arnold testified that he took a statement from Wise on March 21, 1998, and

23 that Wise said that Spohn had told her that when Spohn and Ward were struggling with the

24 victim, Petitioner and Potts were cleaning out the victim's house. (RT 2207.) An objection to

25 that testimony on the basis it was cumulative was overruled, as was an objection that it

26 constituted multiple hearsay. (RT 2207-08.) The trial court found that Detective Arnold's

27 testimony was appropriate impeachment of of Spohn and Wise, and was admissible under

28 California Evidence Code section 1235. (<u>Id.</u>) The appellate court stated on direct appeal:

As noted earlier, Detective Arnold was permitted to testify that Wise told him that Spohn told her that Potts and Blunt were clearing out Jennings' house while Spohn and Ward fought with him. Defense counsel objected on the bases that the answer was cumulative and that it was multiple hearsay. The objection was overruled, the court stating it was impeachment of Spohn's in-court statement as well as Wise's. Appellants now contend the statement was improperly admitted as it was double hearsay.

As noted previously, Evidence Code section 1235 authorizes the admission into evidence of a witness's prior inconsistent statement. Evidence Code section 1201 authorizes the admission into evidence of multiple hearsay. It states:

"A statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule."

Read together, these two statutes "permit admission of multiple hearsay where each hearsay level constitutes a prior inconsistent statement." (*People v. Zapien* (1993) 4 Cal.4th 929, 952.)

Such is the situation here. Detective Arnold testified to this statement after Spohn and Wise had both testified and the trial court held their testimony was properly introduced as prior inconsistent statements under Evidence Code section 1235. The out-of-court statement of Spohn that Potts and Blunt had cleared out the house while he and Ward were fighting was inconsistent with his denial, or failure to recollect at trial, that he had made such a statement. The out-of-court statement of Wise recounting the above described statement of Spohn is inconsistent with her denial, or failure to recollect at trial, that he had made such a statement to her.

The testimony of Detective Arnold may also be seen as permissible, although multiple hearsay, as a prior inconsistent statement and an admission of Spohn. In *In re Ricky B.* (1978) 82 Cal.App.3d 106, 112-113, a witness testified he overheard a conversation between the defendant and another person, but denied the discussion concerned a stolen van. A police officer was permitted to testify that, prior to trial, the witness stated that during the overheard conversation, the defendant and his companion discussed having stolen a van. The court in *In re Ricky B.* ruled this multiple hearsay properly admitted because the witness's pretrial statement to the officer was a prior inconsistent statement and the overheard conversation constituted an admission or an adoptive admission by the defendant. (Evid.Code, §§ 1220, 1221.) Here, Wise's pretrial statement to Detective Arnold can be seen as an inconsistent statement, and the statement by Spohn constituted an admission or adoptive admission. [¶] In either event, the testimony of Detective Arnold was properly admitted.

(Lodgment No. 4, <u>People v. Ward, et al.</u>, No. F035608, slip op. at 24-25.)

Petitioner's contention that the admission of the statement violated his right to confront and cross-examine Arnold, Spohn or Wise regarding the statement is without merit, as all three witnesses testified at trial, were confronted by Petitioner's trial counsel, and were subject to

cross-examination.  See Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) (holding that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."); Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002) (holding that introduction of a hearsay statement does not implicate the Confrontation Clause where the declarant appears at trial and is subject to cross-examination), citing California v. Green, 399 U.S. 149, 161 (1970).

The silent denial of ground eight by the state supreme court was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  Based on an independent review of the record, habeas relief is **DENIED** as to ground eight.

**K.     Petitioner is not entitled to habeas relief as to ground nine.**

In ground nine, Petitioner alleges that his federal due process rights were violated when the jury was instructed that accomplice testimony should be viewed with distrust, but were not instructed that accomplice testimony should not be viewed with distrust to the extent it is favorable to the defense.  (Pet. at 79-92.)  Respondent contends that Petitioner presented this claim to the state courts only in the habeas petition filed in the state supreme court, although an identical claim was raised on direct appeal by Ward, and the Court therefore must conduct an independent review of the record.  (Ans. Mem. at 56-59.)  Respondent contends that the silent denial by the state supreme court was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Id.)

Ground nine was presented to the state supreme court by Petitioner in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 79-92.)  That petition was summarily denied without a statement of reasoning or citation of authority.  (Lodgment No. 18.)  Respondent is incorrect that Petitioner did not present this claim to the appellate court on direct appeal.  Rather, the only other state court to which Petitioner presented ground nine was the state appellate court on direct appeal.  (Lodgment No. 1 at 60-62.)  The Court will look through the silent denial by the state supreme court to the appellate court opinion, which denied the claim stating:

> Appellants contend the trial court erred when it gave former CALJIC No. 3.18 (6th ed.1996) concerning accomplice testimony instead of the version required by our high court in *People v. Guiuan* (1998) 18 Cal.4th 558.  Under the former version of CALJIC No. 3.18, the jury was instructed as follows:

"You should view the testimony of an accomplice with distrust. This does not mean that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case."

In contrast, the first sentence of the version required by *Guiuan* provides: "'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution.'" (*People v. Guiuan, supra*, 18 Cal.4th at p. 569; CALJIC No. 3.18 (1999 rev.) (6th ed.1996).)

The court in *Guiuan* recognized that an accomplice testifying for the defense has no motive to lie, but one testifying for the prosecution clearly does. As the court saw it, the critical point is not the identity of the party who calls the accomplice but rather the identity of the party who is favored by the accomplice's testimony. The court thus concluded that "henceforth, the instruction on accomplice testimony should be 'pretailored' to refer specifically to testimony favorable to the prosecution ...." (*People v. Guiuan, supra*, 18 Cal.4th at p. 570.)

Appellants now claim the trial court erred by giving the former version of CALJIC No. 3.18 disapproved by *Guiuan*. Appellants claim the erroneous instruction operated to their prejudice because portions of Spohn's testimony were favorable to the defense and the jury should not have been told to "distrust" it.

*Cool v. United States* (1972) 409 U.S. 100, 104, on which Ward relies, is inapposite. There, in a case in which the defense rested almost entirely on accomplice testimony, the high court concluded that an instruction essentially directing the jury that exculpatory testimony of an accomplice had to be proved true beyond a reasonable doubt before it could be considered at all, infringed the defendant's Sixth Amendment right to present a defense and effectively reversed the burden of proof to require the defendant to establish her innocence beyond a reasonable doubt. No such flaw appears in California's pattern accomplice instructions as given in this case, and the consequent absence of constitutional error refutes Ward's contention that the *Chapman v. California* (1967) 386 U.S. 18 harmless-beyond-a-reasonable-doubt standard applies. (*People v. Lawley* (2002) 27 Cal.4th 102, 162.)

The trial court should have instructed the jury to view Spohn's testimony with caution to the extent it tended to incriminate appellants. However, appellants were not prejudiced as a result of this failure under any possible relevant standard. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) Although Spohn attempted to mitigate the culpability of appellants during trial, most of his testimony did inculpate appellants. Spohn's testimony placed all appellants at the scene, implicated Ward as the one who beat Jennings, stated Potts and Ward removed the safe, and described the part each appellant took in dividing the property after fleeing the victim's house. In fact, an instruction which told the jury to "distrust" Spohn's testimony most likely operated to appellants' advantage, given the significance of that testimony to the prosecution's case. Moreover, Spohns testimony was corroborated by the physical evidence of the condition of Jennings' house, as well as the testimony of Wise and Moore, which demonstrated appellants' culpability.

The jurors were instructed with the standard accomplice instructions. They were instructed with CALJIC Nos. 3.10 (Accomplice-Defined), 3.11 (Testimony of Accomplice Must be Corroborated), and 3.12 (Sufficiency of Evidence to Corroborate an Accomplice). In addition, CALJIC No. 2.20 was given which

informed the jury that a witness's previous inconsistent statements, admissions of untruthfulness, and bias and motives were all factors which could be considered in determining credibility.

Under these circumstances, it is not reasonably probable that the jury would have reached a result more favorable to appellants had it been instructed with the updated instruction. (*People v. Box* (2000) 23 Cal.4th 1153, 1209; *People v. Arias* (1996) 13 Cal.4th 92, 143; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

(Lodgment No. 4, <u>People v. Ward, et al.</u>, No. F035608, slip op. at 10-12.)

Clearly established federal law provides that in order to merit federal habeas relief, Petitioner must show the instructional error "so infected the entire trial that the resulting conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). Where failure to give an instruction is in issue, the burden on the petitioner is "especially heavy." <u>Kibbe</u>, 431 U.S. at 154. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>California v. Roy</u>, 519 U.S. 2, 5 (1996).

The Ninth Circuit has held that no federal constitutional concerns arise from a jury instruction which requires an accomplice's testimony to be corroborated even to the extent it is favorable to the defendant. <u>United States v. Tirouda</u>, 394 F.3d 683, 687-88 (9th Cir. 2005), citing <u>Cool v. United States</u>, 409 U.S. 100, 103 (1972). Thus, the rejection of this claim by the appellate court, which cited the <u>Cool</u> opinion, was neither contrary to, nor involved an unreasonable determination of, clearly established federal law. <u>Williams</u>, 529 U.S. at 405-07. Neither was it based on an unreasonable determination of the facts. <u>Miller-El</u>, 537 U.S. at 340.

Habeas relief is **DENIED** as to ground nine.

**L.     Petitioner is not entitled to habeas relief as to ground ten.**

Petitioner contends in ground ten that his federal due process rights were violated by the trial court's failure to sua sponte instruct the jury that they must determine whether Kristi Wise and William Moore were accomplices in order to provide the jury the opportunity to subject their testimony to the restrictions on accomplice testimony. (Pet. at 93-104.) Respondent contends this is a variation of ground one, and fails because clearly established federal law does

not preclude convictions based on uncorroborated accomplice testimony. (Ans. Mem. at 59-61.) Respondent also argues that Petitioner was not prejudiced by any instructional error because there was sufficient evidence to support his convictions even without the testimony of these witnesses. (Id. at 61.)

Ground ten was presented to the state supreme court in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 93-104.) That petition was summarily denied without a statement of reasoning or citation of authority. (Lodgment No. 18.) Ground ten was also presented to the state appellate court on direct appeal. (Lodgment No. 1 at 56-59.) The Court will look through the silent denial by the state supreme court to the appellate court opinion, which denied the claim stating:

> An accomplice is defined as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

> "To be an accomplice, a witness must have ""'guilty knowledge and intent with regard to the commission of the crime....'"" (Citation.) The definition of an accomplice 'encompasses all principals to the crime including aiders and abettors and coconspirators.' (Citation.) To be an accomplice, one must act "'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging, or facilitating commission of, the offense.""" (People v. DeJesus (1995) 38 Cal.App.4th 1, 23.)

> By these definitions, it is apparent Ward, Potts, and Blunt were accomplices. Wise and Moore, however, were not. Wise testified that when she arrived home on the evening of February 5, 1998, appellants and Spohn were unexpectedly at her house. Blunt was on top of a safe, trying to open it with a crowbar she assumed was hers. Spohn tried to get her attention to tell her "they" had gotten into a fight and the police were chasing them. Wise testified the contents of the safe were put into bags and the bags placed in the trunk of her car. The group went to Jay Young's house where the items were placed on a pool table and picked over. Wise testified Blunt and Potts told her to keep the rifle taken from Jennings' house. Wise did acknowledge she gave Spohn the steering wheel locking club a month or so before the murder. She gave it to him to use on her car, which he had been using and which had been broken into. She also acknowledged that she helped Spohn leave town after the murder.

> As for Moore, he testified that the morning after the murder, he picked up Ward and from there went to where Blunt and Potts were staying. They then went to Wise's house. While they were at Wise's, Moore overheard Ward and Blunt ask Wise about a bag of items left the night before. Moore acknowledged using Jennings' credit card to gas up his car and several days later to buy numerous items.

> Both Ward and Spohn participated in the attack and robbery on Jennings. Neither implicated Wise or Moore as being even remotely involved as accomplices or conspirators in the attack or robbery. Appellants' argument that

-65-

1    Wise provided Spohn with the murder weapon by giving him the club a month or
     so before the killing and a hat "apparently" belonging to Moore found at the scene
2    of the crime establishes that both were accomplices is without merit.

3          Although the evidence supports the fact that both Wise and Moore
     participated in dividing the victim's property and in concealing and destroying
4    evidence after the murder, it cannot be said they were accomplices under section
     1111. Because the evidence shows Wise and Moore did not commit, encourage
5    or facilitate the murder or robbery, accomplice instructions as to them were
     unnecessary.
6
           Blunt makes a separate but related argument that because Wise and Moore
7    were accomplices, there was no valid corroboration of Spohn's out-of-court
     statement. It is true the testimony of an accomplice requires corroboration.
8    (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128; CALJIC No. 3.11.) However,
     having determined neither Wise nor Moore were accomplices makes the issue
9    moot.

10   (Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 12-14.)

11        As set forth above, clearly established federal law provides that in order to merit federal

12   habeas relief, Petitioner must overcome an "especially heavy" burden of demonstrating that the

13   instructional error "so infected the entire trial that the resulting conviction violates due process."

14   Kibbe, 431 U.S. at 154. Moreover, even if the trial court's failure to give the instruction violated

15   due process, habeas relief would still not be available unless the error had a "substantial and

16   injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Roy,

17   519 U.S. at 5.

18        The appellate court correctly found that Wise and Moore were accessories and not

19   accomplices. Petitioner argues that his federal due process rights were violated because the state

20   court made an arbitrary determination in this regard. (Pet. Mem. at 103-14.) The appellate

21   court's determination was not arbitrary. Rather, the appellate court articulated its reasoning as

22   to why it found Wise and Moore were not accomplices, and Petitioner has failed to demonstrate

23   that the state court's determination is in any manner incorrect, much less arbitrary. Petitioner

24   has not carried his "especially heavy" burden of demonstrating that the failure to give the

25   instruction denied him due process because, as the appellate court found, there was no basis to

26   give the instruction. The appellate court's adjudication of ground ten was neither contrary to,

27   nor involved an unreasonable application of clearly established federal law, and was not based

28

1    on an unreasonable determination of the facts.  <u>Williams</u>, 529 U.S. at 405-07; <u>Miller-El</u>, 537

2    U.S. at 340.

3           Habeas relief is **DENIED** as to ground ten.

4    **M.    Petitioner is not entitled to habeas relief as to ground eleven.**

5           Petitioner alleges in ground eleven that he received ineffective assistance of appellate

6    counsel because his appellate counsel failed to present grounds eight, nine and ten presented

7    here to the state supreme court, even though those claims had been raised in the appellate court

8    by Petitioner's co-defendants and joined by Petitioner.  (Pet. at 105.)  Respondent contends that

9    Petitioner is unable to demonstrate that the silent denial of this claim by the state supreme court

10   was contrary to, or involved an unreasonable application of, clearly established federal law,

11   because the decision to forego presenting the claims was within the range of competence of an

12   appellate attorney, and because there is no duty to raise claims which lack merit.  (Ans. Mem.

13   at 62-64.)

14          Ground eleven was presented to the state supreme court in a habeas petition.  (Lodgment

15   No. 17, mem. attached to pet. at 105.)  That petition was summarily denied without a statement

16   of reasoning or citation of authority.  (Lodgment No. 18.)  Ground eleven was not presented to

17   any other state court, and the Court will therefore conduct an independent review of the record

18   in order to determine whether the silent denial by the state supreme court was contrary to, or

19   involved an unreasonable application of, clearly established federal law.  <u>Lambert</u>, 288 F.3d at

20   1089; <u>Hunter</u>, 982 F.2d at 347-48.

21          As discussed above with respect to grounds eight, nine and ten, the Court has found these

22   claims to be without merit.  Thus, even assuming appellate counsel erred in failing to present

23   them on direct appeal, Petitioner was not prejudiced by counsel's error.  The failure to raise

24   untenable issues on appeal does not fall below the <u>Strickland</u> standard.  <u>See</u> <u>Featherstone v.</u>

25   <u>Estelle</u>, 948 F.2d 1497, 1507 (9th Cir. 1991) (where "trial counsel's performance, although not

26   error-free, did not fall below the <u>Strickland</u> standard[,] ... petitioner was not prejudiced by

27   appellate counsel's decision not to raise issues that had no merit."); <u>Gustave v. United States</u>,

28   627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that

                                                    -67-                                       <span style="float:right">06cv0463</span>

are clearly untenable."); <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982) (stating that attorney's failure to raise meritless legal argument does not constitute ineffective assistance).

The silent denial of ground eleven by the state supreme court was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Habeas relief is **DENIED** as to ground eleven.

**N.    Petitioner is not entitled to habeas relief as to ground twelve.**

Petitioner alleges in ground twelve that his appellate counsel rendered ineffective assistance by misleading Petitioner and incorrectly advising him regarding state procedures. (Pet. at 106.) Specifically, he alleges that to the extent any of his claims are procedurally defaulted in this Court, or were denied on the basis of procedural bars in the state courts, such defaults were the result of: (a) his appellate counsel's failure to file a state habeas petition, even though he told Petitioner he would file one; (b) counsel's belief that it was a meaningless exercise to file a habeas petition in the appellate court because they were never granted; (c) counsel incorrectly informing Petitioner there were no actual time limits on state habeas petitions; and (d) counsel's failure to timely turn over Petitioner's case file. (Id. at 107-12.)

Respondent contends that the allegations in ground twelve fail to state a federal claim because they relate to events which occurred after Petitioner's direct appeal had concluded, at a time when he no longer had a federal Constitutional right to counsel. (Ans. Mem. at 65-66.) Respondent also argues that the advice given to Petitioner by his appellate counsel regarding the timeliness of state habeas petitions was a correct statement of California law, that counsel actually encouraged Petitioner to file a habeas petition, that the decision not to file a state habeas petition was a reasonable tactical decision, and that Petitioner was not prejudiced by any delay in presenting the claims because they are without merit. (Id. at 66-67.)

Ground twelve was presented to the state supreme court in a habeas petition. (Lodgment No. 17, mem. attached to pet. at 106-12.) That petition was summarily denied without a statement of reasoning or citation of authority. (Lodgment No. 18.) Ground twelve was not presented to any other state court, and the Court will therefore conduct an independent review

1  of the record in order to determine whether the silent denial by the state supreme court was

2  contrary to, or involved an unreasonable application of, clearly established federal law.

3  Lambert, 288 F.3d at 1089; Hunter, 982 F.2d at 347-48.

4      The Strickland standard applies to claims of ineffective assistance of appellate counsel

5  as well as trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000). Petitioner is unable to

6  demonstrate deficient performance or prejudice because he has not identified a meritorious claim

7  which his appellate counsel failed to present to the state courts. With respect to his allegation

8  that his appellate counsel caused certain claims to be procedurally defaulted due to his failure

9  to present them on direct appeal or in a timely habeas petition, the only claims presented here

10  which the Court has found to be procedurally defaulted are grounds fourteen and fifteen. As

11  discussed below, the defaults were caused by trial counsel's failure to contemporaneously object

12  to the alleged error, and not by any action or failure to act by appellate counsel.

13      Petitioner has failed to satisfy the Strickland standard with respect to his claim that he

14  received ineffective assistance of appellate counsel, and the silent denial of ground twelve by

15  the state supreme court was neither contrary to, nor involved an unreasonable application of,

16  clearly established federal law. Williams, 529 U.S. at 405-07. Habeas relief is **DENIED** as to

17  ground twelve.

18  **O.    Petitioner is not entitled to habeas relief as to ground fourteen.**

19      Petitioner contends in ground fourteen that his conviction was founded entirely upon

20  decisions and actions by the prosecutor which amount to misconduct, thereby violating his rights

21  under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (Pet. at

22  150.) Specifically, he alleges that as the trial date approached, the prosecutor had essentially

23  no admissible evidence against him which would support any charge other than receiving stolen

24  property or accessory to murder, so the prosecutor offered Spohn a deal where he would plead

25  guilty to second degree murder and be spared the death penalty in exchange for testifying

26  truthfully. (Id. at 150-51.) The prosecutor's real motive, Petitioner alleges, was to have Spohn

27  testify untruthfully for the nefarious purpose of introducing his Arkansas statement to impeach

28  him, and thus introduce the only evidence which implicated Petitioner. (Id. at 151.) Petitioner

contends that the prosecutor also committed misconduct when she argued to the jury that the prosecution's own witnesses were criminals and liars and should not be believed, and that the jury should convict Petitioner on the basis of a theory which was significantly different that the version suggested by the trial evidence.  (Id. at 151-55.)

Respondent contends this claim is procedurally defaulted because it was denied on direct appeal on the basis that trial counsel failed to object to the alleged prosecutorial misconduct. (Ans. Mem. at 72.)  Respondent argues that California's contemporaneous objection rule as applied here is an independent and adequate state procedural rule, and that Petitioner has demonstrated neither cause nor prejudice to overcome the default, nor shown that a fundamental miscarriage of justice would result from the Court not reaching the merits of the claim.  (Id. at 72-73.)  Respondent alternately argues that the claim is without merit because the prosecutor did not commit misconduct.  (Id. at 73-75.)

Ground fourteen was presented to the state supreme court on direct appeal.  (Lodgment No. 7 at 17-20.)  That petition was summarily denied without citation of authority or a statement of reasoning.  (Lodgment No. 8.)  Petitioner also presented this claim to the appellate court on direct appeal.  (Lodgment No. 1 at 77-82.)  The Court will look through the silent denial by the state supreme court to the appellate court opinion, which denied the claim stating:

> Blunt claims the prosecutor committed misconduct by relying on Spohn's initial statement, rather than his trial testimony, in arguing the strength of the evidence against Blunt.  Blunt also complains misconduct occurred in the prosecutor's closing statement.  However, at no time during the alleged acts of misconduct did counsel object.
>
> As we addressed earlier, a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless an assignment of misconduct is made in a timely fashion and it is requested that the jury be admonished to disregard the impropriety.  (People v. Clair, supra, 2 Cal.4th at p. 622.)  This issue has been waived and we will not address it further.  Because the issue has been waived. we also reject Pott's request to join the argument if an evidentiary hearing is ordered.

(Lodgment No. 4, People v. Ward, et al., No. F035608, slip op. at 45.)

The Ninth Circuit has previously found that California's contemporaneous objection rule is independent and adequate in the context of failure to contemporaneously object to prosecutorial misconduct.  Rich v. Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999); Bonin v.

-70-

1    <u>Calderon</u>, 59 F.3d 815, 842-43 (9th Cir. 1995).  Respondent has satisfied the initial burden of

2    pleading as an affirmative defense that Petitioner's failure to satisfy a state procedural rule

3    forecloses federal habeas review.  <u>Bennett</u>, 322 F.3d at 586.  The burden has shifted to Petitioner

4    to challenge the independence or adequacy of the procedural bar.  <u>Id.</u>

5         Petitioner has made no effort to satisfy that burden, other than to argue that the state court

6    was incorrect in finding there were no objections made in light of the fact that the jury was

7    admonished more than twenty different times not to consider evidence against Petitioner.

8    (Traverse at 65.)  Although Petitioner is correct that the jury was frequently admonished, those

9    admonishments were administered by the trial judge in the context of informing the jury that

10   certain statements attributed to Ward or Potts by Spohn, Moore or Bodine were not to be

11   considered when determining the non-declarant's guilt.  (RT 929, 972, 1471-72, 1478, 1496,

12   1509-10, 1579, 1618, 1624, 1648, 1701, 1720, 1727, 1736, 1782, 2605.)  The trial judge

13   similarly admonished the jury that statements attributed to Ward by Moore were not to be used

14   against the other defendants.  (RT 1084, 1814, )  There were only two objections during the

15   prosecutor's closing argument, both contending that the prosecutor was misstating the evidence,

16   and neither resulting in an admonition to the jury.  (RT 2677-78, 2795-97.)  As discussed above

17   in the sufficiency of the evidence claim, only the statements which Petitioner overheard, such

18   as Potts saying it was good that Spohn was along because Jennings would recognize Potts, and

19   Potts' statement to the group "are you ready to do this?", were considered in determining

20   whether there was sufficient evidence to support Petitioner's convictions.  The numerous

21   admonitions to the jury regarding the use of this evidence was to Petitioner's benefit, and

22   resulted from defense counsels' requests.

23        Petitioner has failed to carry his burden of demonstrating that the contemporaneous

24   objection rule was not clearly established or inconsistently applied, and his claim is procedurally

25   defaulted.  In order to have his claim heard on the merits, Petitioner must demonstrate cause and

26   prejudice to overcome the default, or show that a fundamental miscarriage of justice would

27   result from the failure to address the merits of the claim.  <u>Coleman</u>, 501 U.S. at 750.

28        **1. Cause**

The cause prong can be satisfied if Petitioner demonstrates some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. McCleskey v. Zant, 499 U.S. 467, 493-94 (1991). In Edwards v. Carpenter, 529 U.S. 446 (2000), the Supreme Court stated:

> Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice. [Murray v. Carrier, 477 U.S. 478, 488-89 (1986)] Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. Ibid. In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim. And we held in Carrier that the principles of comity and federalism that underlie our longstanding exhaustion doctrine--then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c)--require that constitutional claim, like others, to be first raised in state court. "(A) claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Carrier, supra, at 489.

Edwards, 529 U.S. at 451-52. Petitioner has not demonstrated cause based on his trial counsel's failure to contemporaneously object to the alleged instances of prosecutorial misconduct upon which this claim is based, because he has not exhausted such a claim. Edwards, 529 U.S. at 453. However, even assuming Petitioner could establish sufficient cause to excuse the default, he has failed to establish prejudice.

**2. Prejudice**

To establish the prejudice necessary to overcome a procedural default, Petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under § 2255). "Prejudice [to excuse claims procedurally barred in a habeas case] is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

As discussed above, Petitioner has not established misconduct by the prosecutor in any respect. Morever, Petitioner is incorrect in his contention that he was convicted on a theory which was not established by the evidence. Rather, the only evidence that Petitioner was a

-72-

passive bystander rather than an active participant was the trial testimony of Ward and Spohn that he may have stayed in or by the car while Jennings was being beaten to death and having his home burglarized. As discussed above with respect to the sufficiency of the evidence claim, that testimony was internally inconsistent, inconsistent with the physical evidence and the testimony of other witnesses, and could have reasonably been viewed by the jury as a self-serving attempt to lessen the culpability of everyone involved.

Even assuming it is plausible that the trial testimony of Petitioner's co-defendants supported a finding that Petitioner was not aware of what was going on, as discussed above, there was sufficient evidence aside and apart from the testimony of Spohn and Ward to establish that Petitioner took an active part in burglarizing Jennings' home while he was being murdered. Evidence that Petitioner participated in dividing up Jennings' property, even if it does not support a finding of direct involvement in the murder, certainly does not, as Petitioner contends, establish an opposite finding. Petitioner has failed to demonstrate prejudice to excuse the procedural default with respect to his claim alleging that his conviction was founded entirely upon decisions and actions by the prosecutor which amount to misconduct, because such a claim is without merit.

### 3. Fundamental Miscarriage of Justice

The Court may also reach the merits of a procedurally defaulted claim if Petitioner can demonstrate that the failure to do so would result in a fundamental miscarriage of justice. The Supreme Court has limited the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995). "Actual innocence" means factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is not enough. See Wood v. Hall, 130 F.3d 373, 379 (9th Cir. 1997).

To show actual innocence, Petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Id. Petitioner has failed to carry this burden for the reasons discussed above with respect to his insufficiency of the evidence claim.

06cv0463

Ground fourteen is procedurally defaulted, and Petitioner has failed to demonstrate cause or prejudice to overcome the default, or show that a fundamental miscarriage of justice would result from the Court's refusal to reach the merits of this claim. Alternately, even to the extent Petitioner could overcome the default, the claim would not provide a basis for habeas relief because it is without merit for the reasons discussed in the prejudice analysis. Habeas relief as to ground fourteen is **DENIED**.

**P.      Petitioner is not entitled to habeas relief as to ground fifteen.**

Petitioner contends in ground fifteen that a sentence of twenty-five years to life constitutes cruel and unusual punishment because he had very little involvement in the actual murder and burglary, and the sentence is therefore prohibited by the Eighth Amendment to the United States Constitution. (Pet. at 156-63.) Respondent argues that this claim is procedurally defaulted because it was denied by the appellate court on the basis that Petitioner's trial counsel failed to object to the imposition of the sentence on this basis. (Ans. Mem. at 75-78.) Respondent alternately contends the claim is without merit. (Id. at 78-80.)

Petitioner presented ground fifteen to the state supreme court in a petition for review on direct appeal. (Lodgment No. 7 at 21-26.) That petition was summarily denied without citation of authority or a statement of reasoning. (Lodgment No. 8.) This claim was also presented to the appellate court on direct appeal. (Lodgment No. 1 at 85-92.) The Court will look through the silent denial by the state supreme court to the appellate court opinion, which stated:

> Blunt does not assert the statutory range of punishment for the crimes he committed is facially unconstitutional. Rather, he is claiming the sentence imposed in the "unique situation" here amounted to cruel and/or unusual punishment because it was disproportionate to his individual culpability.
>
> "(C)omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.) As respondent correctly points out, the argument Blunt makes is dependent in its essentials on factual determinations as to the nature of the offense and the culpability of the offender and the danger posed by him to society. Blunt did not address the appropriateness of the sentence at the time of sentencing. He therefore has waived this issue. (*People v. Kelly* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus, supra,* 38 Cal.App.4th at p. 27.)

(Lodgment No. 4, <u>People v. Ward, et al.</u>, No. F035608, slip op. at 45.)

06cv0463

As noted above with respect to ground fourteen, the Ninth Circuit has held that California's contemporaneous objection rule is independent and adequate in the context of failure to contemporaneously object to prosecutorial misconduct in the sentencing phase of a trial. Rich, 187 F.3d at 1069-70. Respondent has satisfied the initial burden of pleading as an affirmative defense that Petitioner's failure to satisfy a state procedural rule forecloses federal habeas review. Bennett, 322 F.3d at 586. The burden has shifted to Petitioner to challenge the independence or adequacy of the procedural bar. Id. Petitioner has made no effort to satisfy that burden. (Traverse at 67-68.) This claim is procedurally defaulted. In order to have his claim heard on the merits, Petitioner must demonstrate cause and prejudice to overcome the default, or show that a fundamental miscarriage of justice would result from the failure to address the merits of the claim. Coleman, 501 U.S. at 750.

Petitioner has made no effort to demonstrate cause for failing to contemporaneously object to the imposition of his sentence. He is also unable to demonstrate prejudice. "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" Ewing v. California, 538 U.S. 11, 20 (2003), quoting Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991). In Ewing, the Court found that a twenty-five years to life sentence for grand theft of $1,200 worth of golf clubs was not cruel and unusual. Id. at 29-30. The United States Supreme Court has also found that two consecutive sentences of twenty-five years to life for petty theft was not cruel and unusual. Lockyer v. Andrade, 538 U.S. 63, 77 (2003) (recognizing that the "precise contours" of the proportionality principle "are unclear," and it is only applicable in "exceedingly rare" and "extreme" cases).

Petitioner's crimes were much more severe than the property crimes in Ewing and Andrade. Petitioner argues that he is forty-eight years old and that it is cruel and unusual to sentence him to a de facto sentence of life without parole for the actions of Ward, Potts and Spohn over which he had no control. (Traverse at 67-68.) However, as set forth above, there was sufficient evidence to establish that Petitioner went along knowing they were going to rob

1    Jennings or burglarize his house, that Petitioner was removing property or ransacking the house

2    while Jennings was being murdered, and that he exerted control over the stolen property.  There

3    was also evidence that Petitioner cut the telephone line and left a severely wounded victim in

4    a rural area, who then attempted to make his way to his neighbor's house before dying in his

5    own orchard.  Even if this was one of the "exceedingly rare" and "extreme" cases implicating

6    the "narrow" proportionality principle, Petitioner's sentence is certainly not disproportionate to

7    his culpability.  Ewing, 538 U.S. at 20; Andrade, 538 U.S. at 77.  Therefore, Petitioner is unable

8    to demonstrate prejudice as a result of the failure to reach the merits of his claim.  Because this

9    claim does not implicate Petitioner's guilt or innocence, he cannot satisfy the fundamental

10   miscarriage of justice standard.  Schlup, 513 U.S. at 327; Wood, 130 F.3d at 379.

11          Ground fifteen is procedurally defaulted, and Petitioner has failed to demonstrate cause

12   or prejudice to overcome the default, or show that a fundamental miscarriage of justice would

13   result from the Court's refusal to reach the merits of this claim.  Even to the extent Petitioner

14   could overcome the default, the claim would not provide the basis for habeas relief because it

15   is without merit for the reasons discussed in the prejudice analysis.

16          Habeas relief as to ground fourteen is **DENIED**.

17   **Q.    Petitioner is not entitled to habeas relief as to ground sixteen.**

18          Although not numbered in the Petition as a separate claim, in the "Conclusion" section

19   Petitioner argues that even assuming any individual error might be harmless, federal law requires

20   a determination as to whether the cumulative effect of the trial errors resulted in prejudice.  (Pet.

21   Mem. at 164.)  Petitioner also requests an evidentiary hearing with respect to this claim.  (Id.)

22   Respondent does not address this issue, but argues that an evidentiary hearing is unnecessary

23   because the Court can rule on the claims on the existing record.  (Ans. Mem. at 20 n.6.)

24

25          This claim was presented to the state appellate court on direct appeal.  (Lodgment No.

26   1 at 83.)  It was not presented to the state supreme court on direct appeal (Lodgment No. 7), but

27   was presented to that court in a habeas petition.  (Lodgment No. 17, mem. attached to pet. at

28   133.)  It was also presented in the habeas petitions filed in the trial and appellate courts.

(Lodgment No. 9, mem. attached to pet. at 32; Lodgment No. 13, mem. attached to pet. at 52.) If the Court is permitted to look through the state appellate court's citation to <u>Harris v. Reed</u> to the trial court's imposition of a state procedural bar regarding the inability of further review on habeas of claims raised on direct appeal, the Court must look to the appellate court opinion denying the claim on direct appeal. <u>Ylst</u>, 501 U.S. at 804 n.3. If the Court is not permitted to look through the <u>Harris v. Reed</u> citation, because it is unexplained, then the Court would also look to the appellate court opinion on direct appeal because it would then be the last reasoned decision of the state courts as to this claim. The appellate court denied the claim, stating:

> Blunt contends the "cumulative effect of numerous errors" of which he complains requires reversal of the judgment. We disagree.

> Several of the errors Blunt complained of were not cognizable on appeal. Others were either nonexistent or harmless, whether viewed in isolation or in cumulation. (*People v. Raley* (1992) 2 Cal.4th 870, 904.)

(Lodgment No. 4, <u>People v. Ward, et al.</u>, No. F035608, slip op. at 45.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007), citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298 (1973). Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." <u>Id.</u>, quoting <u>United States v. Wallace</u>, 848 F.2d 1464, 1476 (9th Cir. 1988). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." <u>Frederick</u>, 78 F.3d at 1381.

Here, there is no basis for finding a due process violation arising from the cumulative effect of any trial errors. As set forth above with respect to Petitioner's other claims, he has not identified any errors to accumulate. Because Petitioner has established no errors which could accumulate to violate due process, the appellate court's adjudication of this claim was neither

contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Habeas relief is **DENIED** as to ground sixteen.

Petitioner's request for an evidentiary hearing is **DENIED**. <u>See</u> <u>Bashor v. Risley</u>, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding that an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record).

**VI.**

**<u>CONCLUSION AND ORDER</u>**

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus is **DENIED**. The Court **ISSUES** a Certificate of Appealability limited to grounds two, three and thirteen only.

**DATED: March 16, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

CC:       ALL PARTIES

06cv0463